Consolidated-Hammer Dry Plate & Film Company, Transferee v. Commissioner.
Consolidated-Hammer Dry Plate & Film Co. v. Commissioner
Docket No. 66701.
United States Tax Court
T.C. Memo 1962-97; 1962 Tax Ct. Memo LEXIS 213; 21 T.C.M. (CCH) 528; T.C.M. (RIA) 62097; April 25, 1962
*213 Petitioner's transferor, an accrual basis taxpayer, received partial payments pursuant to contract provisions providing therefor in contracts with the United States. It attempted to accrue these payments only upon final delivery of finished goods under the contract. Held: 1. Partial payments received under contract provision by an accrual basis taxpayer without restriction as to use constitute income upon receipt regardless of a possibility that such payments may later have to be returned. 2. Proper valuation of the transferor's closing inventory on August 31, 1951, determined. 3. Petitioner has failed to prove the reasonableness of an addition to reserve for bad debts. 4. A deduction of a disputed liability for compensation to a former employee denied during the pendency of the dispute. 5. Petitioner has failed to prove grounds for any alternative method of computing excess profits tax liability. 6. Failure to file an income tax return on time, after extension thereto had expired, was not due to reasonable cause. Maurice P. Raizes, Esq., for the petitioner. David M. Robinson, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent *214 has determined transferee liability against petitioner as follows: Addition
Income
to Tax
Period
Tax
Sec. 291(a)
12/1/49 - 11/30/50
$ 15,966.98
$ 0.00
12/1/50 - 8/31/51
158,087.96
15,808.80
$174,054.94
$15,808.80 Petitioner has admitted that it is a transferee and liable as such, and respondent has conceded as erroneous his addition to petitioner's income (for the latter period) of the amount of a decrease in petitioner's Illinois sales tax liability. The remaining issues are: 1. Whether amounts received by the transferor as partial payments pursuant to Government contracts constitute income when received by an accrual basis taxpayer. 2. In the alternative, whether the transferor's inventory as of August 31, 1951, should be increased by items of labor and labor burden in the amount of $139,417.72 included in the invoices upon which partial payments were made. 3. Whether the transferor's stated inventory on August 31, 1951, was in the amount of $313,616.15 as reported on its income tax return or whether said figure overstates the true valuation of said inventory. 4. Whether the addition of the sum of $4,676.93 to the transferor's bad debt reserve and the deduction of that amount from income in *215 the taxable year ended November 30, 1950, was proper. 5. Whether the deduction of $86,415 for "Compensation to Former Employee" taken by the transferor for its taxable year ended August 31, 1951, was proper. 6. Whether the excess profits tax liability of the transferor for the taxable years in issue should have been determined under section 433(a)(2)(B) or 435(e)(1)(A) of the Internal Revenue Code of 1939. 7. Whether an addition to tax under section 291(a) of the Internal Revenue Code of 1939 for failure to file a return on time was properly assessed against the transferor for the taxable year ended August 31, 1951. Findings of Fact Some of the facts have been stipulated and are so found. Consolidated Photo Engravers and Lithographers Equipment Company (hereinafter referred to as Photo Engravers or as the transferor) was an Illinois corporation which filed its income tax returns on an accrual basis for the taxable periods in issue with the collector of internal revenue at Chicago, Illinois. Such return for the taxable year ending November 30, 1950, was filed on May 15, 1951. The return for the taxable period December 1, 1950, to August 31, 1951, was due to be filed on January 15, 1952, *216 under an extension. It was filed on February 25, 1952. On August 31, 1951, Photo Engravers was merged into Consolidated-Hammer Dry Plate & Film Company, a Delaware corporation and petitioner herein. Petitioner was the surviving corporation of the merger and all of the assets of Photo Engravers in the amount of $477,126.63 were transferred to it. Under the terms of the merger agreement petitioner assumed and agreed to pay all of the debts and liabilities of Photo Engravers. The transfer left Photo Engravers without assets of any kind and rendered it incapable of paying any part of any deficiencies in tax, additions thereto or interest thereon that might be due from it. Petitioner timely assumed and agreed that it would pay the amount of any and all Federal income, excess profits or profits taxes finally determined or adjudged as due or payable by Photo Engravers for the taxable periods involved herein. Timely transferee consents were signed by the parties extending the period of assessment of any transferee liabilities for the years involved to a date subsequent to the mailing of the statutory notice of liability herein. In November 1949, Photo Engravers entered into a contract with *217 the United States Air Force for the construction of a large vertical test camera at a contract price of $39,300. Pursuant to the partial payment provision of this contract, Photo Engravers prepared two invoices dated December 9, 1949, and August 18, 1950. Payments on these invoices were received in its taxable year ending November 30, 1950, in the amounts of $17,298.75 ($142.50 of the amount of the December 9, 1949, invoice having failed to receive approval by the contracting officer) and $7,366.07, respectively. In May 1950, Photo Engravers entered into a contract with the United States Air Force for the construction of a collimator mount at a contract price of $17,500. Pursuant to the provisions of this contract Photo Engravers prepared an invoice dated August 18, 1950, for partial payment thereunder. Payment was received in the amount of $8,405.95 during its taxable year ended November 30, 1950. In February 1951, Photo Engravers entered into a contract with the Corps of Engineers, United States Army, for the construction of 118 metal multiplex tables at a total contract price of $80,706.10, which price was later changed to $80,458.30. Photo Engravers prepared a partial payment invoice *218 dated June 22, 1951, under this contract and received payment thereon in its taxable year ended August 31, 1951, in the amount of $27,226.19. In April 1951, Photo Engravers entered into a contract with the United States Air Force (hereinafter called the April contract) for the construction of 352 photographic printers (hereinafter called CIA printers) at a contract price of $697,300. A contract supplement entered into in September 1953 provided for an additional payment of $195,248.36. The cost classifications and the amounts to be paid for each were as follows: Special tooling
$140,000.00
352 printers
462,000.00
Maintenance data
1,500.00
Engineering data
3,500.00
Spare parts for printers
90,300.00
Total
$697,300.00
Supplement
195,248.36
Grand Total
$892,548.36 Photo Engravers prepared three invoices dated June 10, 1951, July 2, 1951, and August 6, 1951, for payments under the provisions of the April contract. Photo Engravers received payments on these invoices in its taxable year ended August 31, 1951, in the amounts of $73,558.33, $49,324.82, and $44,951.20 respectively. All of these invoices were signed by Photo Engravers' president beneath a statement reading: I certify that the above bill is *219 correct and just; that payment therefore has not been received; that all statutory requirements as to American Production and labor standards and all conditions of purchase applicable to the transaction have been complied with and that state or local sales taxes are not included in the amount billed. These invoices consisted of a face sheet and supporting sheets. All of the foregoing contracts contained the following general provisions: 1. DEFINITIONS As used throughout this contract, the following terms shall have the meanings set forth below: * * *
(b) The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly designated Contracting Officer; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority. * * *
2. CHANGES The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished *220 are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes." However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed. * * *
5. INSPECTION (a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and *221 end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance. (b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. * * * Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes." * * *
6. RESPONSIBILITY FOR SUPPLIES Except as otherwise provided in this contract, (i) the Contractor shall be responsible for the supplies covered by this contract until they are delivered at *222 the designated delivery point, regardless of the point of inspection; and (ii) the Contractor shall bear all risks as to rejected supplies after notice of rejection. 7. PAYMENTS The Contractor shall be paid, upon the submission of properly certified invoices or vouchers, the prices stipulated herein for supplies delivered and accepted or services rendered and accepted, less deductions, if any, as herein provided. Unless otherwise specified, payment will be made on partial deliveries accepted by the Government when the amount due on such deliveries so warrants; or, when requested by the Contractor, payment for accepted partial deliveries shall be made whenever such payment would equal or exceed either $1,000 or 50 percent of the total amount of this contract. The partial payments provisions availed of in all of the foregoing contracts provided as follows: Partial Payments. - Partial payments, which are hereby defined as payments prior to acceptance on work in progress for the Government under this contract, may be made upon the following terms and conditions. (a) The Contracting Officer may, from time to time, authorize partial payments to the Contractor upon property acquired or produced *223 by it for the performance of this contract: Provided, that such partial payments shall not exceed 75 percent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer: Provided further, that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated advance payments, if any, made under this contract, exceed 80 percent of the total contract price of supplies still to be delivered. (b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and non-durable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: Provided, that nothing herein shall deprive *224 the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract. (c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained. * * *
(f) If this contract (as heretofore or hereafter supplemented or amended) contains provisions for Advance Payments, and in addition if at the time any partial payment is to be made to the Contractor under the provisions of this partial payments clause any unliquidated balance of advance payments is outstanding, then notwithstanding any other provision of the Advance Payments Clause of this contract the net amount, after appropriate deduction for liquidation of the advance payment, of such partial payment shall be deposited in the special bank account or accounts maintained as required by the provisions of the Advance Payments Clause, and shall thereafter be withdrawn only pursuant to such provisions. The various payments received under the several *225 contracts were reported on Photo Engravers' income tax returns as follows: Taxable Year *
Sought to be re-
ported by peti-
tioner in in-
Date of Invoice
Amount
Received
Reported
come of:
Dec. 9, 1949
$17,298.75
1950
1950-51
1951
Aug. 18, 1950
7,366.07
1950
1950-51
1951
Aug. 18, 1950
8,405.95
1950
1950 **
**
June 10, 1951
73,558.33
1951
**
**
June 22, 1951
27,226.19
1951
**
**
July 2, 1951
49,324.82
1951
**
**
Aug. 6, 1951
44,951.20
1951
**
** Respondent has determined that all of the partial payments made constituted taxable income upon receipt. He has given Photo Engravers credit in the taxable year ending August 31, 1951, for the sum of $24,664.82 reported by it on partial payments attributable to items delivered during this period but which were received and also reported in income for the preceding taxable year. In its income tax return for its taxable year ended August 31, 1951, in *226 the computation of cost of goods sold per Schedule A of said return, Photo Engravers showed inventory at the end of such year of $313,616.15. It had taken a physical inventory as of August 31, 1951, and records as of that date were made. These records reveal the following totals: Material and Labor
$283,715.31
Material only
253,363.14
Labor only
30,352.17 In arriving at the inventory figure mentioned above, Photo Engravers added $29,900.84, designated as representing burden of almost 100 percent on labor, to the amount representing labor and materials. In its income tax return for the taxable year ended November 30, 1950, in Schedule G, Photo Engravers added a gross amount of $4,676.93 to its reserve for bad debts and deducted that amount in computing its net income. In the statutory notice of deficiency the respondent disallowed that amount as a deduction. Photo Engravers computed its reserve for bad debts by taking 5 percent of its total outstanding accounts receivable as of November 30, 1950, in the amount of $153,885.95, which reserve totaled $7,694.30. The addition to the reserve was computed by adding $4,676.93 to its beginning reserveof $3,017.37 in order to make up the amount of *227 $7,694.30. Photo Engravers' gross sales for the year ended November 30, 1949, were $764,072.67 and gross sales for the year ended November 30, 1950, were $914,426.32. The total accounts receivable outstanding for the year ended November 30, 1949, of Photo Engravers was $110,223.78. The ages of the accounts receivable on Photo Engravers' books as of November 30, 1950, were as follows: Less than 30 days
$104,024.72
30 to 60 days
6,341.83
60 to 90 days
11,363.46
90 to 120 days
1,106.30
Over 120 days
31,049.63
Total
$153,885.94
During the period between December 1, 1946, and November 30, 1950, Photo Engravers wrote off no bad debts. In its income tax return for its taxable year ended August 31, 1951, Photo Engravers accrued and deducted the amount of $86,415, which was designated as "Compensation to Former Employee," under Schedule K of said said return. During that taxable year Russell W. Borrowdale, a former employee of Photo Engravers, filed suit in the Superior Court of Cook County, State of Illinois, for alleged compensation due him from Photo Engravers for a prior year, and after contested litigation he obtained judgment in the amount of $86,415 against Photo Engravers. Photo Engravers did not *228 pay the judgment, but posted an appeal bond and took an appeal from said judgment to the State of Illinois Appellate Court for the First District. On June 18, 1952, the judgment was reversed and remanded, and upon rehearing judgment was entered in favor of Photo Engravers, which judgment was affirmed on February 17, 1955. Photo Engravers accrued the sum of $86,415 as a deduction in its taxable year ended August 31, 1951, but petitioner later made a reversing entry including such sum in income in a subsequent year after said judgment was reversed. Respondent disallowed said deduction. Photo Engravers' failure to timely file its income tax return for the taxable year ended August 31, 1951, was not due to reasonable cause. Opinion Petitioner, although disputing any deficiencies, admits that it is liable as transferee of Photo Engravers, and we so find. Issues 1 and 2 The major dispute between the parties is whether the partial payments are taxable income upon receipt, as urged by respondent, or whether they are taxable only upon delivery of the final product for which they are partial payment. Photo Engravers originally included $24,664.82 of payments received in the year ended November *229 30, 1950, in income for that year. Delivery of the products thus partially paid for was made in the taxable year ended August 31, 1951, and the partial payments were again included in income. Petitioner claims a credit for the former year in which it alleges that the inclusion was improper. Respondent has not included this amount in income for the latter year. Petitioner included all other partial payments received in those two taxable years under the contracts involved herein in its income for taxable years beginning after August 31, 1951, since delivery thereunder occurred in such later periods. Respondent contends that the payments were received without restriction as to use, were not loans, and therefore were taxable upon receipt as being received under a claim of right. North American Oil v. Burnet, 286 U.S. 417 (1932). In the alternative he argues that the payments were for the work completed to date, title to which vested under the contracts in the Government, and are therefore taxable as payments for goods sold. Petitioner relies on the fact that the contracts could be unilaterally altered or canceled by the Government. It further buttresses its position that the payments *230 were conditional by calling them advances or loans, by showing that all products were subject to inspection, that favorable tests of the product were required, and that errors were made in the invoices. Scrutiny of the cases in this area leads one to the broad generalization that where payments are received but may have to be returned in the future, whether or not such payments will be treated as income when received depends on the relationship between the right to receive and the obligation to repay. In instances where the happening of a condition subsequent has been required to compel return of payments received, the receipt was held to have given rise to taxable income. Wallace A. Moritz, 21 T.C. 622 (1954); Whitaker v. Commissioner, 259 F. 2d 379, 382 (C.A. 5, 1958), affirming 27 T.C. 399 (1956); Charles F. Dally, 20 T.C. 894 (1953), affd. 227 F. 2d 724 (C.A. 9, 1955), certiorari denied 351 U.S. 908. However, where the right to keep the payments was conditional in the first instance, or if the contract remained executory, the payments will not result in income to an accrual basis taxpayer until the condition is fulfilled or the contract is executed. Webb Press Co., Ltd., 3 B.T.A. 247 (1925); *231 Veenstra & DeHaan Coal Co., 11 T.C. 964 (1948). In two cases accrual basis taxpayers actually receiving partial payments have been taxed thereon at the time of receipt. In Charles F. Dally, supra, the contract provided that payment "shall" be made upon submission of certified invoices for 90 percent of articles delivered and accepted or services rendered. We found that: (20 T.C. at po 899) While the contract was in the course of performance neither party contemplated any course other than that payments were to be figured and paid on the basis of the estimates. As we see it, the petitioner's right to be paid ripened and became absolute upon the submission of the certified periodical estimates. That right did not depend upon a recheck of the figures shown on the estimates; and neither was the amount to be paid governed only by completed units actually delivered. The project engineer for the Government was called as a witness by the petitioner. He testified that there naturally were deviations between the estimates and actual completed units delivered, and, in response to the Court's question as to whether payments were made according to the estimates or actual count, responded, "the *232 payment was made on the basis of the periodical estimate." * * * In Capital Engineering Co., 25 T.C. 1283 (1956), taxpayer, a subcontractor, submitted periodic billings to the prime contractor pursuant to an understanding of the parties that payment would be made pursuant to monthly billings. We held that the taxpayer received income as the billings were actually made, even though the billings therein, as were the estimates in Dally, were only approximations. In the instant case the parties understood that partial payment was to follow the submission of the certified invoices. The discretion in the contracting officer was in approving the items in the invoices. These invoices had been checked by a Government cost analyst who certified that he had verified the costs claimed thereon. Upon payment, title in the property or materials produced to the date of such payment vested in the Government. After partial payments have been made, the Government may still require the contractor to make changes, may terminate the contract, or may reject articles as unfit or unusable even though they have passed the preliminary inspection typically concurrent with the partial payment. We are unable to *233 distinguish the instant case from Dally and Capital Engineering. As was noted in those cases, payment was to be made on the basis of the invoices. Similarly, in the instant case, no dispute existed over Photo Engravers' initial right to the payments. We therefore conclude that Photo Engravers had an unrestricted right to receive the amounts in fact received during the taxable years involved herein and should have included such amounts in their entirety in gross income. The above resolution of Issue 1 requires us to deny respondent's alternative contention in Issue 2. Issue 3 Photo Engravers reported a closing inventory of $313,616.15 on its income tax return for the taxable year ended August 31, 1951. Petitioner now alleges that the aforementioned sum is erroneous and that the correct figure is $254,790.05. In support of its contention that the reported closing inventory was overstated, petitioner introduced work sheets prepared in 1954 purporting to adjust the valuation of the inventory as of August 31, 1951. These work sheets allegedly resulted from an audit commenced by petitioner after an Internal Revenue Service agent named Reichman had noticed errors in petitioner's inventory. *234 Petitioner's president, purchasing agent, and accountant consulted with Reichman after preparing the adjustments, and invoices were presented to him at that time. Petitioner produced but two invoices, only one of which unequivocally indicates error in the reported figures. However, several credible witnesses testified that in 1954 they actually observed the substantiation for the reduced valuations. A substantial duplication of one item was also pointed out by petitioner, amounting to over $17,500. Respondent offered as a witness an accountant who had supervised the physical inventory in 1951. Although his testimony is credible, he admitted accepting the management's valuations of raw materials and used equipment, the very items here in dispute. Reichman was not called upon to testify by either party. Although regretting that we have denied his testimony, we conclude that petitioner has sustained its burden of proof on this issue. On its face there appears to be a sizable error in the original inventory. The invoices introduced tend to reveal further inaccuracies. Testimony supporting the lower cost figures advanced by petitioner has been received, and no contrary evidence is before *235 us. There is also uncontroverted testimony that the lower figures now proposed by petitioner reflect the usual cost-price differential in its transferor's industry. Respondent seems to rely wholly on the reported inventory figure, citing Hutchins Lumber & Storage Co. v. Commissioner, 53 F. 2d 1016 (C.A. 7, 1931). That case involved an unchallenged and uncorrected figure, a lapse of time of 10 years, and parol testimony of an interested party. Even so the court recognized that the returned inventory figure was subject to explanation and correction. Considering the entire record, we accept petitioner's revaluation of $254,790.05 as the value of Photo Engravers' inventory as of August 31, 1951. Issue 4 During the period December 1, 1946, to November 30, 1950, Photo Engravers wrote off no bad debts. [1] *236 During this entire period the reserve for bad debts was carried on the books at the amount of $3,017.37. On November 30, 1950, an addition of $4,676.93 was made to this account so that the new balance equaled 5 percent of accounts receivable. Respondent has determined this amount to be unreasonable. Reserves for bad debts are generally within the educated discretion of the taxpayer, subject only to the outer limit of reasonableness as determined by the Commissioner. Paramount Liquor Co. v. Commissioner, 242 F. 2d 249 (C.A. 8, 1957). What constitutes a reasonable reserve depends on numerous factors, among which are past experience as to collection, the nature of the business, business conditions, and expectations of probable losses. Mill Factors Corporation, 14 T.C. 1366 (1950). It is proper when considering reasonableness in retrospect to observe the extent of losses incurred in subsequent years. Shield Co., 2 T.C. 763 (1943). Photo Engravers' president (also the president of petitioner) testified that no bad debts had been written off during either taxable year in issue, although the ledger sheet indicates two such charges in minimal amounts. Numerous write-offs occurred during 1953, *237 well after the merger of Photo Engravers into petitioner. However, the cases considering the relevance of later occurrences to the reasonableness of a prior reserve for bad debts attach significance to the debts actually becoming worthless in the later period, not to the additions to the reserve in later years. Shield Co., supra; Albert C. Becken, Jr., 5 T.C. 498 (1945). Petitioner has not shown that a reserve of 5 percent of accounts receivable was reasonable on November 30, 1950. No write-offs of any moment occurred until December 31, 1953, after Photo Engravers had been out of existence more than 2 years. During the 7-year period ending December 31, 1953, the original reserve, $3,017.37, was more than adequate to cover all debts written off. Petitioner has offered no proof as to the practice or experience in its industry, and we find no basis for overturning the determination that the addition to the bad debt reserve on November 30, 1950, was unreasonable. West Virginia Steel Corporation, 34 T.C. 851 (1960). Issue 5 Petitioner is seeking to sustain the deduction as an expense in the taxable year ended August 31, 1951, of a claim of $86,500 asserted during such year against *238 Photo Engravers by a former employee. Photo Engravers denied liability, refused to pay, and prevailed on appeal in a subsequent taxable year after having had a judgment entered against it by the trial court. It is well settled that an accrual basis taxpayer may not accrue an expense the liability for which is contingent. Security Mills Co. v. Commissioner, 321 U.S. 281 (1944). In Dixie Pine Co. v. Commissioner, 320 U.S. 516 (1944), the Court refused to permit the accrual of a gasoline tax where the taxpayer was strenuously contesting its liability therefor in the courts. The treatment prescribed by the Court was to await the result of the litigation and to accrue the deduction when the tax liability was finally adjudicated. See United States v. Consolidated Edison Co., 366 U.S. 380 (1961). The reasoning underlying these decisions was explained in National Biscuit Company v. United States, 156 F. Supp. 916, 922 (Ct. Cl., 1957), as follows: The underlying reason for such a rule is that where the taxpayer has not paid the expense and is contesting it, he may never incur it, thus, it should not be deductible until it is incurred. The point of accrual in a contested liability case *239 would be the year in which the court makes its determination. Applying the foregoing principles we conclude that the $86,500 deduction was improper. The fact that petitioner subsequently made a reversing entry after final judgment was entered in its favor does not make the prior deduction allowable. Issue 6 Petitioner in its pleadings raised issues regarding alternative computation of excess profits taxes. It seems to have abandoned these issues on brief. It introduced no evidence regarding either alternative proposed in its pleadings. It has not filed an application for the benefits of section 433(a)(2)(B) of the 1939 Code. See Regs. 130, sec. 40.433(a)-3(d). It has similarly made no showing of total payroll or net sales for the base period years, necessary for a section 435(e)(1)(A) computation. We therefore sustain respondent's method of computation, although a Rule 50 computation will be required because of the decisions on other issues. Issue 7 Petitioner asserts that the fact that its president was too busy to see that its income tax return for its taxable year ended August 31, 1951, was timely filed constitutes reasonable cause for failure to file on time. The unavailability *240 of a corporate officer is not reasonable cause. M. & F. Holding Corporation, 26 B.T.A. 504, 508 (1932). Petitioner had procured a 2-month extension of time in which to file its return, but had not availed itself of this opportunity to file on time. Petitioner has failed to show any reasonable cause why its return was not filed except that its president was busy and that he personally had to approve the return prepared by petitioner's accountants. The president testified that he could not attend to the tax return because he had to "go where the emergency was the greatest." We find this argument capricious, and sustain respondent's application of the addition to tax under section 291(a) for the taxable year ended August 31, 1951. Decision will be entered under Rule 50. Footnotes
*. For convenience in this table the taxable year ending November 30, 1950, is called "1950," and the taxable year December 1, 1950, to August 31, 1951, is called "1951." ↩
**. Petitioner seeks to report these sums in income during the taxable years in which shipments were made under the contract. All of such years commenced after August 31, 1951.↩
1. All statutory references are to the Internal Revenue Code of 1939. Section 23(k) provides: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; * * *↩