ANITA GREEN and HOWARD GREEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Green v. Commissioner
Docket No. 6195-73.
United States Tax Court
T.C. Memo 1974-248; 1974 Tax Ct. Memo LEXIS 64; 33 T.C.M. (CCH) 1106; T.C.M. (RIA) 74248; September 23, 1974, Filed. Howard Green, pro se. Albert L. Sandlin, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $9,114.28 in the petitioners' [1] Federal income tax for the year 1968 and an addition to tax of $455.71 under section 6653(a), Internal Revenue Code of 1954. [2] The issue for decision is whether petitioner's distributive share of partnership income is $14,654.50, as reported in his Federal income tax return, or $38,124.50, as determined by respondent. Petitioner does not independently dispute the addition to tax under section 6653(a). *65 FINDINGS OF FACT Petitioner and his wife were legal residents of Chamblee, Georgia, at the time the amended petition was filed. They filed a joint Federal income tax return for the taxable year 1968. The record does not show where the return was filed. Prior to 1968, petitioner and James M. Crow were equal partners in a business known as the Master Salon for Beauty. Master Salon was succeeded in the latter part of 1967 and early 1968 by Wig Masters, a new partnership in which petitioner and Crow continued as equal partners. Wig Masters engaged in the business of selling wigs. Subsequent to the year in issue, on October 15, 1968, the assets and liabilities of Wig Masters were transferred to two corporations, Wig Masters, Inc., and Wig Masters Import Co., Ltd. Petitioner and Crow were equal 50 percent owners of each corporation. In addition to the partners and their wives, Wig Masters employed between three and seven persons during 1968. The partnership records were kept in an informal and incomplete manner. During the summer of 1968 the partnership contacted the accounting firm of Benson & Farmakis and subsequently requested it to perform a certified audit for the period *66 January 1, to September 30, 1968. The accountants prepared an income statement for that period and a balance sheet as of September 30, 1968. The accuracy of the balance sheet was certified but, because of the state of the partnership records, no opinion was expressed on the correctness of the income statement. No partnership return was filed covering the period ending September 30, 1968. On petitioner's Federal income tax return for 1968 he reported income of $14,654.50 from the partnership. The accountants' uncertified income statement reconstructed the partnership income as follows: Sales
$630,466
Cost of Goods Sold 410,401
Gross profit on sales
$220,065
Operating expenses: Salaries and wages
$ 14,697
Supplies
8,526
Utilities
8,056
Advertising
15,239
Bad debts
4,337
Freight
9,052
Rent
5,350
Automobile expense
799
Taxes and licenses
2,578
Repairs and maintenance
571
Burglar alarm rental
782
Insurance
240
Legal and accounting
818
Bank charges
154
Samples
801
Brokers' fees
322
Travel
226
Postage
2,674
Depreciation
538
Miscellaneous 718 76,478
Net income from operations
$ 143,587
Income charge - interest 57
Net income $ 143,530
Allocation of net income: James M. Crow
$ 71,765
Howard L. Green $ 71,765 Total $ 143,530
*67 By letter dated October 19, 1968, petitioner and Crow represented to their accountants, among other things, that: 1. All liabilities have been taken up on the books of account, including the liability for all purchases to which title had passed prior to the stated date. * * * 9. No events have occurred and no facts have been discovered since September 30, 1968 which would make materially inaccurate or misleading the balance sheet as of that date or the income statement for the period then ended. No shortages or irregularities were discovered during the period from January 1, 1968 through September 30, 1968 that either have been closed or are now under investigation or otherwise unsettled, which have not been disclosed to you; and to the best of our knowledge there is nothing reflecting upon the honesty of members of our organization. By the time a revenue agent discovered that Wig Masters had not filed a partnership return for the period involved, most of the partnership records, including those used by the accountants in their audit, had either been lost or misplaced, or were otherwise unavailable. Other than the audit report itself, the only records germane to the determination *68 of partnership income discovered by respondent and admitted into evidence are those of Benson & Farmakis relating to the audit. They are mostly workpapers prepared during the valuation of closing inventory. For want of a more reliable method of computation, respondent was compelled to base his deficiency determination primarily on the accountants' income statement. Factors unknown to the accountants caused the income statement to be incorrect and false. Petitioner and his partner, desiring to present to creditors a flattering financial portrait of the business, withheld from Benson & Farmakis an invoice showing an account payable of $46,217. They also persuaded certain of Crow's relatives to permit fictitious accounts receivable to be set up in their names in the partnership books. As of September 30, 1968, these accounts stood as follows: Margaret Dean
$4,996.98
William J. Crow
2,980.50
Eula Crow 13,087.00
Total
$21,064.48
In his notice of deficiency the respondent adjusted the Benson & Farmakis income statement figures to reflect the above overstatement of receivables and understatement of payables. Respondent also omitted from closing inventory an *69 amount added by the accountants in their final report after the physical inventory to reflect a check drawn against a letter of credit. The closing inventory value of Wig Masters on September 30, 1968, was certified by the accountants as a part of the balance sheet they prepared. The figure was arrived at by a physical count performed by the employees of Wig Masters and confirmed by Benson & Farmakis. The employees performed the physical count individually and the partnership's bookkeeper supplied cost figures. The bulk of the inventory was counted by employees other than petitioner and Crow. The inventory was valued on a first-in, first-out basis, so that the price used to value each item was that shown by the most recent invoice. The accounts personally observed the physical count of inventory in the partnership's main warehouse, and visited its two retail stores. They test counted and test priced selected areas and selected items. For the price test Benson chose several current invoices out of a number that were furnished to him. He selected those items representing substantial dollar values in relation to the whole inventory, then sought recent invoices to support pricing *70 of those items. The invoices used were current invoices. Approximately 50 percent of the dollar value of inventory was price tested, and the accountants' test figures agreed with those arrived at by the employees. In confirming the inventory value Benson & Farmakis followed these procedures: 1. Observe and test count inventory. 2. Prepare inventory comment suitable for inclusion in workpapers. 3. Test footing of entire inventory. 4. Test extension of approximately 50 percent of items. 5. Compare inventory sheets retained with priced inventory generally for errors and other alterations. 6. Trace test counts to priced inventory. 7. Test pricing of approximately 50 percent of dollar value of inventory. 8. Adjust for sales and receivings from date of physical inventory to September 30. Benson prepared and signed an inventory comment sheet, stating in part: Based on my observations and test counts, it is my opinion that a materially accurate physical count of the various inventory items was made. The inventory was conducted on September 22, 1968. The inventory value on that date was $96,655.64. Between September 22 and October 1, 1968, inventory totaling *71 $15,336 was received, and items totaling $21,489.51 were sold. The inventory value on September 30, 1968, was $90,502.13. There is no evidence of any value to be assigned to opening inventory, and petitioner does not assert any such value. The partnership income and petitioner's distributive share were, as calculated by the accountants and adjusted by respondent, as follows: Sales
$609,402.00
Purchases
$547,120.00
Less closing inventory 90,502.00 Cost of goods sold 456,618.00
Gross profit on sales
152,784.00
Operating expenses 76,478.00
Net income from operations
76,306.00
Income charge - interest 57.00
Net income
76,249.00
Petitioner's distributive share (50%)
38,124.50
OPINION The amended petition in this case apparently proceeds on the assumption that the respondent based his deficiency determination exclusively on the Benson & Farmakis financial statements. Petitioner alleges: The inventory was inflated some 40% to 50% and the accounts receivable [sic] were inflated some $25,000.00 for the purpose of giving a healthy financial picture of the corporation. [3]
*72 In fact, as we have found, the overstatement of accounts receivable in the Benson & Farmakis report totaled $21,064.48. This figure was established from letters solicited by the accountants and signed by the purported debtors. The testimony of Crow, petitioner's witness, shows only that his knowledge or memory of the event is faulty: Q [petitioner] Did you ask your mother, father and aunt to sign and return statements to the firm of Benson and Farmakis showing that they owed $25,000.00 to our company? A [Crow] Yes. The signed statements in evidence do not support the higher figure.Because respondent by his notice of deficiency and on brief conceded that these accounts were sham, we are not required to evaluate the evidence offered to show that they in fact represent genuine transactions. The only remaining disputed issue concerns the correctness of the closing inventory figure. It is open to petitioner to challenge by credible evidence the respondent's valuation, even though it is based on the reports of the partnership's own accountants. Elm City Nursery Co., 6 B.T.A. 89 (1927); *73 see Consolidated-Hammer Dry Plate & Film Co., 21 T.C.M. 528 (1962), affirmed in part and reversed in part on other issues, 317 F.2d 829 (C.A. 7, 1963). However, the report of a taxpayer's own auditor is highly persuasive evidence of its own accuracy. Emilie Furnish Funk, 29 T.C. 279 (1957), affirmed in part and remanded in part on other issues, 262 F.2d 727 (C.A. 9, 1958). Petitioner faces a particularly difficult task here in attempting to overcome the presumptive correctness of the respondent's determination. The respondent's reliance on the Benson & Farmakis income statement was compelled by the total failure of the partners to maintain and produce any records on which a reconstruction of income could be based. The original lack of adequate records, noted by the accountants in 1968, is compounded by the unexplained disappearance of even the incomplete existing data at some subsequent time. In such circumstances the respondent was entitled to resort to any method likely to produce a reasonably accurate measure of income. Any method *74 that is not arbitrary and unreasonable will support the presumption of correctness and place the burden of proving a more reliable measure upon the taxpayer. Fuller v. Commissioner, 313 F.2d 73 (C.A. 6, 1963); see Roybark v. United States, 218 F.2d 164 (C.A. 9, 1954). In regard to inventories, the required recordkeeping is made still more explicit by section 1.471-2(e), Income Tax Regs.: Inventories should be recorded in a legible manner, properly computed and summarized and should be preserved as a part of the accounting records of the taxpayer. The inventories of taxpayers on whatever basis taken will be subject to investigation by the district director, and the taxpayer must satisfy the district director of the correctness of the prices adopted. In order to prevail on the valuation of inventory, petitioner must demonstrate with particularity the errors alleged to exist in the respondent's determination. "Estimates and conjectures do *75 not overcome the presumption." Broadhead v. Commissioner, 254 F.2d 169 (C.A. 5, 1958), affirming a Memorandum Opinion of this Court; Estate of Albert Cohn, 61 T.C. 787 (1974). The required proof is not supplied by the testimonial assertion that inventory was overvalued, Hutchins Lumber & Storage Co. v. Commissioner, 53 F.2d 1016 (C.A. 7, 1931), affirming 13 B.T.A. 956 (1928). Not only must the petitioner demonstrate that the respondent erred; he must also prove facts in support of a more accurate computation. Bangor Punta Operations, Inc. v. United States, 466 F.2d 930 (C.A. 7, 1972). Petitioner's evidence falls far short of what is required. Because he did not testify, the Court does not have the benefit of whatever light he might have shed on the issues. He did attempt to prove, by the testimony of Crow and the accountant Benson, that the partners systematically misled their accountants. Benson testified that some of the wigs purchased by Wig Masters were imported; that imported wigs were less expensive than those purchased within the United States; that invoices for his price test were obtained from the *76 company's bookkeeper; and that he used only invoices from domestic suppliers. Crow testified that domestically purchased wigs were 25 percent to 40 percent more expensive than imported wigs; that he gave invoices to the bookkeeper; and that he furnished the accountants with the highest priced invoice available for each item. This testimony, even if accepted in its entirety, cannot upset the respondent's valuation of closing inventory. None of the allegedly lower priced invoices were presented for comparison with the accountant's worksheets that were introduced into evidence. Nor does the record show that the high priced invoices used in the price test were not the most recent ones, as required by the partnership's accounting method. Crow's vague estimate of the price difference between imported and domestic wigs is useless without a showing of the actual prices and quantities of imported items included in inventory. Viewed as a whole, the testimony of petitioner's witnesses gives his argument slight support. Benson stated that he had no reason to believe that the inventory valuation was other than accurate and correct. The procedures followed by the accountants in verifying *77 the physical inventory were rigorous. Petitioner's other witness, Crow, proved evasive on cross-examination. Speaking of the invoices supplied to the accounts, he said: "I didn't say they weren't the proper invoices. I said they were the higher priced invoices." Pressed to say more precisely how much the inventory was inflated, he was unable to improve on the "25% to 40%" estimate. In short, petitioner has failed to show any basis for a recomputation of the value assigned to opening inventory by respondent, or even to produce any credible evidence that the deficiency determination was erroneous. Our conviction that the closing inventory figure in dispute was correctly arrived at requires us to find in favor of respondent. However, one aspect of the record deserves further comment. The respondent assigned no value to opening inventory in computing the partnership's income. If in fact there was opening inventory on hand, from the predecessor partnership or some other source, in this first taxable year of Wig Masters, then income was overstated by that amount. There is no evidence in the record to show either presence or absence of opening inventory as of January 1, 1968. *78 Petitioner has the burden of proof on this issue. It is at this point that we regret most acutely petitioner's failure to obtain professional assistance in preparing and presenting his case to the Court. His spirited actions on his own behalf do not mask his lack of sophistication in legal and accounting matters, and it may be he simply overlooked the question of opening inventory. Whatever the cause for this gap in the record, we are unable to grant petitioner any relief in the absence of any proof of value. Harry Hartley, 23 T.C. 353 (1954), modified on another issue, 23 T.C. 564. See Miller Saw-Trimmer Co., 32 B.T.A. 931 (1935); Sam E. Broadhead, 14 T.C.M. 1284 (1955), affd. expenditures. F.2d 169 (C.A. 5, 1958). Therefore, we sustain respondent's determination. Having held in respondent's favor with respect to the deficiency, we must also sustain the addition to tax under section 6653(a). Petitioner does not separately challenge the addition and, considering the inadequacy of the partnership's records, the failure to file a partnership return, and the amount of unreported income involved, we are satisfied that at *79 least some portion of the underpayment was the result of negligence or willful disregard of rules and regulations. Decision will be entered under Rule 155. Footnotes
1. Anita Green is a party only by virtue of having filed a joint income tax return with her husband, hereinafter referred to as petitioner. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. The "corporation" referred to is apparently either Wig Masters, Inc., or Wig Masters Import Co., Ltd., which succeeded to the assets of the partnership shortly after the taxable year here in issue. ↩