ALBERT C. BECKEN, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4600. Promulgated July 27, 1945.

*Samuel H. Horne, Esq.*, for the petitioner.
*Carroll Walker, Esq.*, for the respondent.

502

OPINION.

*Issue I.*

ARUNDELL, *Judge*: Petitioner contends that the $17,000 he received from the executor of Clark's estate in 1941, in compromising the suit for specific performance, was the result of a sale or exchange of a capital asset which he "constructively" received in 1932, namely, $40,000 of capital stock in the A. C. Becken Co. In his return for 1941 he treated the $17,000 as a capital gain, making no attempt to

compute a basis for his "asset." He now takes the position, however, that he made an overpayment, on the theory that his basis was $40,000 and that in reality he sustained a capital loss of $23,000. He argues that, even if his basis is zero, the sum of $17,000 is to be treated only as a capital gain, subject to the restrictions of section 117 of the Internal Revenue Code.[1] Respondent has treated the entire sum of $17,000 as ordinary income within the scope of section 22 (a) of the Internal Revenue Code. His contention is that whatever right petitioner had stems from an employment contract, and that payments received in compromise settlement of such contracts constitute ordinary income.

We can not agree with petitioner's contention that he constructively received $40,000 in capital stock in 1932. The "doctrine of constructive receipt is one to be applied sparingly. It is only in unique circumstances and a clear case that the invoking of this doctrine will be approved." *Hal E. Roach*, 20 B. T. A. 919, 924. Petitioner did not report the receipt of the stock in his return for 1932 or for any other later year prior to 1941. The doctrine of constructive receipt may not be invoked to have income placed in a year where, because of the statute of limitations, the tax thereon may not be collected. *Alice H. Moran, Executrix*, 26 B. T. A. 1154; affd., 67 Fed. (2d) 601. In that case we said, at page 1157:

> * * * The doctrine of constructive receipt at most is a conceptual device whose "primary function is to bring about a fair and reasonable application of income tax. * * *"

Cf. *J. O. W. Gravely*, 29 B. T. A. 29; *Raleigh* v. *United States*, 5 Fed. Supp. 622.

Petitioner apparently treats his alleged right to the $40,000 of capital stock as resting in a contract separate and apart from the agreement whereby Clark undertook to employ him. We do not think that is proper. The agreement to issue the stock forms an integral part of the entire contract. It is no more severable from petitioner's obligations in item three to "devote his entire time and attention in and about the operation of the business" and in item five not "in anywise for the period of five (5) years * * * directly or in-

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l) * * *

* * * * * * *

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 18 months, if and to the extent such gain is taken into account in computing net income.

directly [to] engage in any competing business under any name containing 'Becken' or 'Becken Company,'" etc., than is the agreement in item two that petitioner should have a minimum cash bonus of $10,000. Just as in the case of the $10,000 cash bonus, the agreement to issue the stock is attributable to petitioner's undertaking to work for the new corporation, or to his undertaking not to compete for a period of five years, or both. If it is attributable to the agreement to work, the value of the stock when received would be ordinary income, *Walter P. Coleman*, 8 B. T. A. 1126; and if it is attributable to the agreement not to compete, the value when received would still be ordinary income, *Beals' Estate* v. *Commissioner*, 82 Fed. (2d) 268, affirming 31 B. T. A. 966. Certainly the result is not different if the right to the stock is attributable to both.

We can not say that petitioner ever "owned" a capital asset of which he could dispose. The only judicial determination of which there is evidence in the record, as to his right to the stock, was against him. Be that as it may, however, if the stock, when and if acquired, represented compensation either for services or for an agreement not to compete, then upon the principle of *Lyeth* v. *Hoey*, 305 U. S. 188, and *Margery K. Megargel*, 3 T. C. 238 (on which petitioner most strongly relies), and other similar cases, that the "nature and basis of the action [here the specific performance suit] show the nature and character of the consideration received upon compromise," the sum of $17,000 stands upon the same footing as ordinary income.

In the *Megargel* case Mrs. Megargel actually owned stock, acquired from her husband in part payment of loans she made to him. She was induced by fraudulent representations to transfer that stock to another. Later, she sued to have the transfer annulled and the stock returned to her, or, if it could not be returned, to have payment for the present value thereof. The litigation was compromised, and the defendant in the action paid to Mrs. Megargel a cash settlement. It was held that the amount received was upon the sale of a capital asset; that the taxpayer, because of fraud, had parted with capital; that she sued to recover it; and that, having by compromise recovered the cash equivalent of the stock from which she had parted, she made a recovery of capital. We do not understand how that holding lends any support to petitioner's position here. Here, petitioner did not "own" a capital asset from which he was induced to part by fraudulent representations.

In view of our conclusion that the compromise settlement and the payment of $17,000 did not constitute a capital transaction, it is unnecessary for us to consider petitioner's contention with respect to his "basis." We think respondent has properly treated the entire sum of $17,000 as ordinary income.

## *Issue II.*

The question here is whether petitioner is entitled to a deduction of all or any part of the $2.887 "Discount and Bad Debt Reserve."

We have found as a fact that $892.61 of that sum was for a volume, quantity, or trade discount, definitely ascertained as due the Ferrell Jewelry Co. at the end of the taxable year and not contingent upon payment at any particular time. It was in no sense a contingent liability as of December 31, 1941. Since it was a liability definitely incurred during the taxable year, and since petitioner's books were kept on an accrual basis, he was entitled to accrue that sum. I. T. 1272, I–1 Cumulative Bulletin 123, 124 (1922).[2] According to section 43 of the code, deductions are to be taken for the taxable year in which "paid or accrued," or "paid or incurred." The fact that the item was improperly termed a reserve on petitioner's books does not prevent its deductibility if it was properly accrued. *Rogers, Brown & Crocker Bros., Inc.*, 32 B. T. A. 307. Petitioner is therefore entitled to a deduction of the amount of $892.61 in the computation of gross sales for the taxable year. *American Lace Mfg. Co.*, 8 B. T. A. 419.

There is no evidence in the record as to the amounts of the 5 percent volume or trade discounts which petitioner testified were owing to three or four customers at the end of 1941, and we are, therefore, unable to make any allowance for those discounts.

As for the 2 percent cash discounts, it is clear that they were, as of the end of the taxable year, contingent liabilities; and it is now well settled law that reserves for such liabilities are not allowable deductions. *American Cigar Co.*, 21 B. T. A. 464. Cf. *Lucas v. American Code Co.*, 280 U. S. 445. No allowance may be made, therefore, for the cash discounts.

Finally, we have found that of the $2,887, the sum of $664.80 was allocated for bad debts reserve. There is express statutory provision for the deductibility of reasonable additions to reserves for bad debts,[3] and the provisions of the statute have been implemented by the Bu-

---

[2] There must be an actual liability incurred before an amount may be accrued. Where a liability has actually been incurred and is uncertain only in the actual amount necessary to discharge it and the actual date at which it must be discharged, and amount representing a reasonable estimate of such actual liability incurred may be set up as an accrual and will constitute an allowable deduction for Federal income tax purposes for the taxable year in which such liability was actually incurred. * * *. Where a liability is not to be incurred until the happening of some contingency, such contingency must happen before there is, of course, a liability actually incurred, and prior to such time no amounts can properly be accrued in respect thereof for income tax purposes.

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

* * * * * * *

(k) BAD DEBTS.—
(1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; * * *

reau's regulations.[4]  By virtue of Regulations 103, section 19.23 (k)–1, a "taxpayer filing a first return of income" has an election to adopt the charge-off method or to establish a reserve.  The taxable year in question here was the first in which petitioner was operating as an individual in the jewelry business.  We think, therefore, that he is to be treated as a new taxpayer filing a first return of income, within the meaning of section 19.23 (k)–1.  Section 19.23 (k)–5 of the regulations provides that a taxpayer who adopts the reserve method of treating bad debts may deduct from gross income a reasonable addition to a bad debt reserve.

The burden, of course, was on petitioner to prove the reasonableness of the amount allocated to a bad debts reserve, but the findings, we think, amply demonstrate that petitioner has discharged that burden.  The amount of $664.80 was roughly 1 percent of the accounts receivable at the end of the taxable year, exclusive of the Ferrell account.  It has been said that "the correctness of the taxpayer's estimate in fixing the amount to be added to the reserve in any year may be supported by reference to the losses actually incurred in subsequent years  *  *  *." *Farmville Oil & Fertilizer Co.* v. *Commissioner*, 78 Fed. (2d) 83.  The evidence here shows that in 1942 $1,000.61 was actually charged to the reserve account in respect of accounts receivable on December 31, 1941.  Surely, under all the

[4] Sec. 19.23 (k)–1. Bad debts.—(a) Bad debts may be treated in either of two ways—
(1) By a deduction from income in respect of debts ascertained to be worthless in whole or in part, or
(2) By a deduction from income of an addition to a reserve for bad debts.

Taxpayers were given an option for 1921 to select either of the methods mentioned for treating such debts. (See article 151, Regulations 62.)  The method used in the return for 1921 must be used in returns for all subsequent years unless permission is granted by the Commissioner to change to the other method.  A taxpayer filing a first return of income may select either of the two methods, subject to approval by the Commissioner upon examination of the return.  If the method selected is approved, it must be followed in returns for subsequent years, except as permission may be granted by the Commissioner to change to another method.  Application for permission to change the method of treating bad debts shall be made at least 30 days prior to the close of the taxable year for which the change is to be effective.  (See also section 19.23 (k)–5.)

Sec. 19.23 (k)–5. Reserve for bad debts.—Taxpayers who have established the reserve method of treating bad debts and maintained proper reserve accounts for bad debts, or who, in accordance with section 19.23 (k)–1, adopt the reserve method of treating bad debts, may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of a deduction for specific bad debt items.

What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of the facts, and will vary as between classes of business and with conditions of business prosperity.  It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.  In case subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve should be reflected in the determination of the reasonable addition necessary in the taxable year.  A taxpayer using the reserve method should make a statement in his return showing the volume of his charge sales (or other business transaction) for the year and the percentage of the reserve to such amount, the total amount of notes and accounts receivable at the beginning and close of the taxable year, and the amount of the debts which have been ascertained to be wholly or partially worthless and charged against the reserve account during the taxable year.

circumstances here, it can not be said that petitioner's estimate of $664.80 was not a reasonable one.

We conclude, therefore, that petitioner is entitled to a deduction of $892.61 for the Ferrell trade discount and to a deduction of $664.80 for bad debts reserve, but not to a deduction of any amount for cash discounts.

*Decision will be entered under Rule 50.*