LASZLO FONO AND PAULETTE FONO, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1008–77.     Filed October 27, 1982.

---

[6]See *Reed v. Commissioner*, T.C. Memo. 1978–58.

*Norman I. Book, Jr.*, for the petitioners.
*Rebecca T. Hill*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined a deficiency in petitioners' Federal income tax for 1972 in the amount of $167,576. Other issues having been resolved by agreement between the parties,[1] the only issue remaining for decision is what part, if any, of a payment received by petitioners in 1972 in settlement of a dispute with the Quaker Oats Co. should be allocated to personal injuries within the meaning of section 104(a)(2).[2]

FINDINGS OF FACT

1. General

Petitioners Laszlo Fono and Paulette Fono are husband and wife. They filed a joint Federal income tax return for 1972 with the Internal Revenue Service Center, Fresno, Calif. At the time the petition in this case was filed, petitioners resided in San Francisco, Calif.

Petitioners are native Hungarians. They left Hungary in 1956, following the Hungarian revolution, and arrived in the United States as refugees in 1957. Petitioners first settled in Colorado, where they remained for about 8 years. During this time, Mr. Fono first worked in a taxidermy shop, then as a groundkeeper at a country club. Later, for most of the last 4 years that petitioners lived in Colorado, he worked in a bank processing checks and doing bookkeeping.

Mr. Fono had acquired some minimal bookkeeping experience working in his father's china and hardware business in Hungary. He had also taken basic accounting classes in secondary school in Hungary and took accounting classes,

---

[1] In the notice of deficiency, respondent disallowed a deduction in the amount of $558 claimed by petitioners for the expenses of "preparation of will and estate planning." The record does not contain an explicit concession of this issue by petitioners. They have not contested the issue, however, and we consider them to have acceded to respondent's determination.

[2] All section references are to the Internal Revenue Code of 1954 as in effect during the tax year in issue, unless otherwise noted.

including a basic tax course, at night school while he was working for the bank in Colorado. Mr. Fono was not a professional accountant, however. In particular, he had no professional experience in income tax matters, and he never prepared his own or anyone else's U.S. tax return. Mrs. Fono also worked in a bank in Colorado for 7½ years, but the record does not reveal what her duties were.

## 2. The Magic Pan

While petitioners were living in Colorado, Mrs. Fono also did some catering from her house, often serving crepes prepared according to a recipe that she had learned from her mother. The crepes were a great success with Mrs. Fono's customers, many of whom encouraged her to open a restaurant. Petitioners decided to act on this suggestion; they moved to San Francisco in 1964 and in the next year there opened a restaurant named The Magic Pan. The restaurant featured crepes cooked in a special pan that petitioners had patented. The restaurant was small, seating only about 20 guests, but it won an enthusiastic response from its customers, and petitioners received several inquiries about purchasing or franchising the business.

Petitioners opened a second, larger[3] Magic Pan in San Francisco's Ghirardelli Square shopping center in 1967. Petitioners continued to receive inquiries from outsiders, including large national concerns, who expressed interest in getting in "on the ground floor" of their business. Petitioners commenced negotiations with several large companies, including Stouffer Foods Corp. and Holiday Inns, for the purchase by these companies of The Magic Pan. None of these negotiations produced a final agreement, however, until Quaker Oats Co. (hereinafter Quaker) became interested.

## 3. The 1969 Agreements

Petitioners commenced negotiations with Quaker no later than October 1968. These negotiations culminated in four agreements which were formally concluded in January 1969

---

[3]The second restaurant seated 65 guests.

(hereinafter referred to as the 1969 agreements), the provisions of which are described as follows:

(a) *Purchase agreement.*—Petitioners agreed to sell, and Quaker agreed to buy "the restaurant business * * * known as The Magic Pan" for a total price, exclusive of inventory,[4] of $56,015.94, allocated as follows:

| | |
|---|---:|
| Leasehold improvements | $22,570.56 |
| Restaurant equipment | 21,026.72 |
| Furniture and fixtures | 8,816.51 |
| Office equipment | 1,256.15 |
| Automotive equipment | 1,346.00 |
| Trademarks and goodwill | 1,000.00 |
| Total | 56,015.94 |

The purchase agreement also provided for the execution of the remaining three agreements concurrently with the closing of the purchase agreement.

(b) *Assignment agreement.*—Petitioners assigned to Quaker the patent for their special pan for making crepes, related trade secret technology, and various formulas and recipes for and in consideration of $221,584.06. In addition, Quaker agreed—

As additional purchase price installments for the Patent * * * to pay to ASSIGNORS 30/100's of 1 percent of ASSIGNEE's net sales, if any, of frozen crepe products * * * during each fiscal year ending June 30, commencing July 1, 1969, and continuing through June 30, 1979, payable within 90 days of the end of each such year, but in no event shall such additional purchase price installments in any year exceed the sum of $60,000.00. * * *

(c) and (d) *Employment agreements.*—Separate employment agreements were entered into with petitioners providing that they would both be employed for a period of not less than 5 years by Magic Pan, Inc., a subsidiary of Quaker newly formed to operate the restaurant business. The agreements were substantially identical except that the annual base salary provided for was $30,000 for Mr. Fono and $20,000 for Mrs. Fono. Each employment contract contained the following bonus provision:

4. In addition to your base salary, you will receive an annual bonus of five

---

[4]The inventory was to be sold at the closing at petitioners' cost.

percent of the profits, if any, of our restaurant subsidiary for each fiscal year ending June 30, commencing July 1, 1969 and continuing through June 30, 1979, payable within 90 days of the end of each such year, determined by deducting from the gross income of our restaurant subsidiary

(a) all costs and expenses associated with the business (except Federal taxes on income, interest on loans and this bonus) determined in accordance with generally accepted accounting principles and procedures as reported in audited financial statements of our restaurant subsidiary, and,

(b) fifteen percent of the total assets of our restaurant subsidiary as reported in audited financial statements as of the end of the particular fiscal year, and

(c) fifteen percent of the value of leases of our restaurant subsidiary, which value shall be determined by multiplying the annual rent by the number of years the lease has to run.

Mr. Fono became president of Magic Pan, Inc., and Mrs. Fono became vice president and assistant secretary. Both of them were on the board of directors.

Petitioners' association with Quaker did not prove to be as successful as they had hoped when they entered into the 1969 agreements. On the contrary, the relationship soon soured and eventually became a source of great distress to petitioners. Much of petitioners' ill feelings was caused by their personal incompatibility with their immediate superior, Frederick Montgomery (Montgomery), the Quaker executive whom the company appointed to oversee Magic Pan, Inc.[5]

The troubled personal relationship between petitioners and Montgomery only increased the difficulty of resolving their disagreements about the management of the business. When openings of new Magic Pans failed to proceed smoothly and Magic Pan, Inc., suffered losses in the years after the acquisition by Quaker, much acrimony accompanied the process of fixing the blame. Montgomery wrote memoranda to his superiors which criticized petitioners' contribution to the business and impugned their personal integrity. Although petitioners did not learn of these memoranda at the time, Montgomery was also sharply critical of them in their dealings with him.

In addition to their difficulties in dealing with Montgomery, petitioners believed that Quaker had failed to live up to its representations as to its expertise, experience, and resources

---

[5]Montgomery was Magic Pan, Inc.'s chairman of the board.

for managing and franchising restaurants at the time of the 1969 agreements. Petitioners were also upset that they were forced to play an employment role (work on practical restaurant management) rather than the one (consulting and public relations work) that they had anticipated in the development of new Magic Pan restaurants. Petitioners were also disappointed that they never received any payments under the bonus clauses contained in their 1969 employment agreements and set forth above. Petitioners came to believe that the clauses were unfair, both because of the manner in which "profits" were computed,[6] and because the management of the company, and, consequently, the power decisively to influence its profitability, were out of their hands.

Petitioners similarly received no payments under the provision of the assignment agreement granting them a percentage of Quaker's net sales of frozen crepe products. After considerable testing and market research, Quaker concluded that petitioners' recipes were unsuitable for frozen crepes and that the frozen crepes would be uneconomical to produce.

Petitioners were especially disturbed by the failure of these provisions to produce any income to them, because they had believed at the time of the 1969 agreements that the amount of money they had then received, about $277,000, was much less than the value of what they had transferred. They had understood that the difference would be made up by payments under the bonus provisions of the employment agreements and the assignment agreement's provision for a share in the net sales of frozen crepe products. Based on projections drawn up by Quaker, petitioners anticipated receiving additional amounts between $1,200,000 and $1,500,000 under the bonus provisions of the employment agreements and as much as $600,000 under the assignment agreement.

## 4. The 1972 Settlement

Petitioners' dissatisfaction with their relationship with

---

[6]Petitioners believed, based on the advice of their accountant after he reviewed the bonus clauses, that the start up costs of the new restaurants would make it nearly impossible to earn "profits" as computed in the bonus clauses, and, consequently, that their opportunity to earn bonuses was merely an illusion. Some Quaker executives who reviewed the Magic Pan situation came to the same conclusion.

Quaker on both the business and personal level led them in 1971 to seek a renegotiation of the 1969 agreements. By January 31, 1972, petitioners had engaged Kurt Melchior (Melchior), a San Francisco attorney, to represent them in the negotiations. Melchior was a general practitioner at the time he represented petitioners, but he was experienced in tax law,[7] and was aware of the tax effects of the settlement described below.

The negotiations lasted about 7 months. Several options were considered, including the continuance of petitioners in their employment with Quaker with a reformed bonus agreement, a new role for petitioners as part-time consultants, and a complete severance of petitioners' relationship with Quaker. By July 7, 1972, petitioners had concluded that a continued relationship with Quaker was impracticable and that they wanted instead to negotiate a buy-out in which all their claims against the company would be settled.

Several proposals and counterproposals were made respecting the terms of the buy-out agreement. Negotiations concerned both the amount of the settlement and the allocation of the total to the various claims being settled. At one point, petitioners indicated that they wanted a substantial portion of the settlement allocated to their claim that Quaker had caused them great emotional distress during the years of their association. This suggestion was emphatically rejected by Quaker.

As the negotiations neared completion, a draft of the final agreement was prepared by Quaker. That draft provided for petitioners to receive a payment of $425,000. Of that amount, $325,000 was allocated to the termination of the employment agreements, and $100,000 to the termination of petitioners' rights under the assignment agreement. No amount was allocated to the release of petitioners' claim of emotional distress. After receiving Quaker's draft, Melchior inserted a provision allocating the amount of $1 to "any and all other claims being released." Melchior made this change because he

---

[7]Melchior had served for 4 years in the U.S. Department of Justice, during which time he was exclusively engaged in tax law. A graduate of Yale Law School, he has served as vice president and a member of the Board of Governors of the State Bar of California and, at the time of the trial, was a member of the House of Delegates of the American Bar Association.

understood, based on his communications with Quaker and petitioners, that the claim of emotional distress was also being settled, although nothing was being paid for it, and he believed that some nominal provision should be made, "for all other claims so that it would be very clear that the agreement would finish everything once and for all." Melchior explained the reason for the insertion of the provision to Quaker and to petitioners.

Melchior discussed the tax consequences of this allocation with petitioners. He explained that, after deducting taxes and his estimated fees, petitioners would retain about $220,000 to $240,000 of the gross settlement of $425,000. Petitioners, however, apparently did not fully understand the significance of Melchior's advice regarding the income tax consequences of the settlement.

Prior to execution of the settlement, petitioners were provided with copies of the draft agreement for their review. The draft provided for the following allocation of the total payment of $425,000: $324,999 to petitioners' rights and claims under the employment agreements, $100,000 to petitioners' rights and claims under the assignment agreement, and $1 to "any and all other claims being released." Mrs. Fono crossed out the apportionment provision on her copy of the draft agreement and made the following notations in the margin:

| | |
|---|---|
| $100 | Royalty L.T.C. gain |
| 75 | Employment |
| 250 | Damages—Non Performing |
| $425 | |

By suggesting an allocation of $250,000 to "Damages—Non Performing," Mrs. Fono was referring both to the emotional stress to which petitioners felt they had been subjected by Quaker and to what petitioners regarded as Quaker's default under the bonus provisions of the employment agreements and the assignment agreement's provision for a share in the net sales of frozen crepe products. Mrs. Fono did not further allocate this item between its two components.

Mr. Fono also included his comments in the margin of his copy of the draft agreement. He proposed the following allocation:

$250 — for all physical and mental damages, mislead, no salary raise, no stock dividend option, FDM terrible behavior, antitrust

75 — employment

100 — long term capital gain

The allocation of $250,000 to "physical and mental damages" and other items was not broken down by Mr. Fono among those various items.

Despite petitioners' suggestions to the contrary, the allocation provision of the final settlement was unchanged from the draft. The settlement (hereinafter referred to as the 1972 settlement) was formally concluded on August 24, 1972. It was cast in the form of a letter from petitioners to Quaker and Magic Pan, Inc. The parts pertinent to this case provided as follows:

This will confirm the terms upon which we have agreed to settle all existing contracts, claims and other relationships between ourselves on the one hand, and your two companies on the other. We should like to confirm that in the negotiation of these arrangements we have been represented by independent counselors of our choice * * * and we understand that you have also been advised by your Law Department. Each of us is entering into this agreement with full knowledge of the underlying facts and circumstances, having made such investigations as each of us may have deemed proper, and without any duress or coercion of any nature whatever.

It is accordingly agreed:

1. Effective August 31, 1972, the employment agreements between The Quaker Oats Company and Laszlo Fono, and between The Quaker Oats Company and Paulette Fono, including their employment under such agreements with Magic Pan, Inc., which is a wholly owned subsidiary of The Quaker Oats Company, shall terminate. * * *

\* \* \* \* \* \* \*

3. Concurrent with the execution of this letter agreement, we will exchange mutual releases from each of us to each of you, and from each of you to each of us, * * * releasing one another * * * from any and all claims which any releasing party may have against such released party, relating to the sale of the Magic Pan restaurant business by us to you on January 21, 1969, relating to the employment agreements between The Quaker Oats Company and each of us dated January 21, 1969, relating to the assignment by us to you of United States Letters Patent, 3,349,726 and related properties on January 21, 1969, related to any negotiations, representations and other communications between us concerning the subject matters thereof, and to any other claims, known or unknown, which each of us may have had against the others.

4. In consideration of the early termination of all of the agreements hereinabove referred to, and of the other matters being released, you will pay us at the execution hereof the sum of Four Hundred Twenty-Five Thousand Dollars ($425,000). Of said sum, Three Hundred Twenty-Four Thousand Nine Hundred Ninety-Nine Dollars ($324,999) shall be in consideration of the termination of our rights and claims under the employment agreements of January 21, 1969, the sum of One Hundred Thousand Dollars ($100,000) shall be in consideration of the termination of our rights and claims under the assignment agreement of January 21, 1969, and the sum of One Dollar ($1.00) shall be in consideration of any and all other claims being released.

In their joint Federal income tax return for 1972, petitioners reported $66,667[8] of the total $425,000 which they received under the 1972 settlement as ordinary income. The remainder, $358,333, was not included in gross income. A footnote to petitioners' return provided the following explanation:

Taxpayers settled a suit during the year and received balance of employment contract, reported as income in this return, and $368,333 regarded as liquidated damages on account of injury to personal reputation and damages to health.[9]

In its original corporate income tax return for its taxable year ended June 30, 1973, The Magic Pan, Inc., deducted the entire amount of the payment made to petitioners under the 1972 agreement. The item was described in the return simply as "Contract Settlement—$425,000."[10]

In the notice of deficiency issued to petitioners on November 19, 1976, with respect to their taxable year 1972, respondent stated his determination that, of the total amount received by petitioners pursuant to the 1972 agreement, $325,000 represented ordinary income, and the remaining $100,000 represented long-term capital gain from the sale of their patent and secret trade processes. The parties now agree that respondent's determination regarding the $100,000 found to consti-

---

[8]This was roughly the amount of the salary payments that petitioners would have received for the remainder of the 5-year terms of their employment contracts.

[9]As noted above, $358,333 was the amount excluded from gross income. The statement in the footnote that the amount was $368,333 was apparently due to clerical error.

[10]The record does not reveal Quaker's theory in treating the entire payment as deductible. It appears that the $100,000 allocated to the assignment agreement should have been treated as part of the cost of acquiring capital assets, and, consequently, capitalized and depreciated rather than deducted currently.

tute long-term capital gain is correct. They remain in dispute as to the tax consequences of the remaining $325,000.

### 5. The 1980 Settlement

The 1972 settlement, although it terminated petitioners' employment with Quaker, did not end the bitterness which had come to characterize their relationship with the company. Shortly after the 1972 settlement was entered into, petitioners were asked by Quaker to sign applications for liquor license renewals for Magic Pan, Inc. Petitioners complied with this request, but later worried that, because they were no longer associated with the company, Quaker had tricked them into signing "fraudulent" documents. Petitioners also believed that Quaker had hindered them in their plans to open a Hungarian restaurant in Ghirardelli Square.[11] Petitioners were also upset by newspaper articles which appeared in connection with the openings of various Magic Pans; petitioners thought that the Quaker representatives quoted in the articles failed to give them the credit to which they were due as creators of the Magic Pan concept. In addition, they knew that they "had a tax problem." This last conclusion was based on the advice of an attorney, an old school friend of Mr. Fono's, who reviewed the 1972 settlement and advised petitioners that "some very bad consequences" would flow from it. In addition, their accountant, who reviewed the settlement in preparing petitioners' income tax return for 1972, informed them that there was a tax liability "inherent" in the settlement of "possibly $225,000."[12]

As a result of their continuing dissatisfaction with Quaker, and of the problem they perceived with respect to the tax consequences of the 1972 settlement, petitioners, in 1975, filed suit against, among other defendants, Quaker and Magic Pan,

---

[11]Petitioners thought that Quaker tried to stop them from obtaining a lease by representing, falsely, to the owners of Ghirardelli Square that the proposed restaurant would violate the terms of the 1972 settlement.

[12]The accountant, nevertheless, prepared the return, as described above, by treating much of the proceeds of the settlement as allocable to petitioners' claim of emotional distress and, consequently, excludable from gross income. This treatment yielded a much lower tax liability than the one that he had initially advised petitioners was "inherent" in the agreement.

Inc. The complaint alleged 19 different causes of action, including fraud, breach of contract, interference with prospective advantage, defamation, and intentional infliction of mental distress. Petitioners prayed for total money damages in the amount of $26,900,000, as well as other relief.

One of the asserted causes of action relates particularly to the present case. In the "Sixth Cause of Action," petitioners alleged that, due to their clerical error, the allocation provided for in the 1972 settlement did not reflect the intent of the parties. Petitioners alleged that they had discovered the error during the preparation and filing of their tax return for 1972. They prayed that the court reform the allocation provision of the agreement to read as follows:

4. In consideration of the release of our rights under the agreements hereinabove referred to, and of the other matters being released, you will pay us at the execution hereof the sum of Four Hundred Twenty-five Thousand Dollars ($425,000). Of said sum, One Hundred Fifty Thousand Dollars ($150,000.00) shall be in consideration of the termination of our rights and claims for unpaid purchase price under the January 21, 1969 assignment; the sum of One Hundred Fifty Thousand Dollars ($150,000) shall be in consideration for our claims of impaired capital due to misrepresentation, and the sum of Seventy-five Thousand Dollars ($75,000) shall be for damages due to defamation, and the balance shall be in consideration of our rights and claims under the employment agreements of January 21, 1969.

Petitioners' suit against Quaker never went to trial. Petitioners, Quaker, and Magic Pan, Inc., executed a settlement agreement in December 1980 (hereinafter referred to as the 1980 settlement). Quaker agreed to pay petitioners $175,000 in settlement of their claims for emotional and physical distress. They also agreed that the allocation provision of the 1972 settlement was reformed to read as follows:

4. In consideration of the release of our rights under the agreements hereinabove referred to, and of the other matters being released, you will pay us at the execution hereof the sum of Four Hundred Twenty-five Thousand Dollars ($425,000). Of said sum, One Hundred Thousand Dollars ($100,000) shall be in consideration of the termination of our rights and claims for unpaid purchase price of capital assets sold to The Quaker Oats Company; the sum of Two Hundred Fifty Eight Thousand, Three Hundred Thirty-four Dollars ($258,334) shall be for damages due to physical and emotional distress arising out of our employment with Magic Pan, Inc; and the balance shall be in consideration of our rights and claims under the employment agreements of January 21, 1969.

Magic Pan, Inc., agreed to amend its Federal income tax returns to reflect the reformed allocation.

By the time the 1980 settlement was entered into, Quaker had spent more than $500,000 in outside legal fees defending itself against petitioners' suit, and it anticipated spending "substantially" more to try the case than the $175,000 that it paid to petitioners to settle it.

In accordance with the 1980 settlement, Magic Pan, Inc., amended its Federal corporate income tax return for its taxable year ended June 30, 1973. As noted above, the entire settlement of $425,000 had been deducted in the original return. In the amended return, $100,000 of the $425,000 was capitalized to reflect the allocation of this amount in the 1980 settlement to the termination of petitioners' rights and claims for the unpaid purchase price of capital assets.

## OPINION

The taxability of the proceeds of the settlement of a claim depends on the nature of the claim. The question to be asked is: "In lieu of what were the damages awarded?" *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943); *Western Products Co. v. Commissioner*, 28 T.C. 1196, 1208 (1957); *Tygart Valley Glass Co. v. Commissioner*, 16 T.C. 941, 949 (1951). This is the rule whether the settlement is achieved through a judgment or by a compromise agreement. *Lyeth v. Hoey*, 305 U.S. 188 (1938). Accordingly, amounts received by an employee in lieu of payments under his employment contract are usually taxable as ordinary income. *Knuckles v. Commissioner*, 349 F.2d 610 (10th Cir. 1965), affg. a Memorandum Opinion of this Court; *Glynn v. Commissioner*, 76 T.C. 116 (1981), affd. 676 F.2d 682 (1st Cir. 1982); *Becken v. Commissioner*, 5 T.C. 498 (1945). By contrast, payments representing a replacement of capital are taxable only to the extent that they exceed the basis of the property replaced, and then only as capital gain. *Durkee v. Commissioner*, 162 F.2d 184, 187 (6th Cir. 1947), remanding 6 T.C. 773 (1946); *State Fish Corp. v. Commissioner*, 48 T.C. 465, 473 (1967); *Sager Glove Corp. v. Commissioner*, 36 T.C. 1173 (1961), affd. 311 F.2d 210 (7th Cir. 1962). Finally, damages received, whether by suit or agreement, on account of personal injuries or sickness are excludable from gross income altogeth-

er. Sec. 104(a)(2); sec. 1.104–1(c), Income Tax Regs.; cf. *Roemer v. Commissioner*, 79 T.C. 398 (1982).

In the present case, there are two contending allocations of Quaker's $425,000 payment to petitioners. Respondent has determined, and here contends, that the tax consequences are governed by the allocation contained in paragraph 4 of the 1972 settlement agreement. Petitioner contends that the tax consequences are controlled by reformed paragraph 4 as set forth in the 1980 agreement.

Although petitioners' case was carefully tried and skillfully briefed, we conclude that the allocation made in the 1972 settlement agreement controls the tax liabilities here in dispute. The $425,000 paid by Quaker pursuant to that agreement (with the possible exception of $1) was not received by petitioners "on account of personal injuries or sickness" within the meaning of section 104(a)(2). To the contrary, that agreement specifically allocated the payment to other disputed claims: $324,999 was "in consideration of the termination" of petitioners' "rights and claims under the employment agreements," $100,000 was "in consideration of the termination" of petitioners' rights under the 1969 agreement assigning the crepes machine patent and the recipes, and $1 was "in consideration of any and all other claims being released." The Fonos received nothing in that settlement (except possibly the $1) to compensate them for personal injuries causing emotional distress.

This 1972 agreement was the product of 7 months of negotiations in which petitioners were represented by a competent, experienced lawyer. It was reached only after numerous other possibilities, including continued employment under a reformed bonus agreement and a new role with Quaker and Magic Pan, Inc., for petitioners as consultants and public relations assistants, were considered and explored. Those possibilities were ultimately rejected in favor of a complete severance of petitioners' relationship with Quaker.

The manner in which the $425,000 would be allocated between petitioners' various claims as an incident to the severance was discussed in depth between petitioners and their attorney and negotiated specifically with Quaker's representatives. Their final agreement on the allocation of the payment was memorialized in paragraph 4 of the 1972

agreement. True, petitioners sought an allocation of a portion of the agreed payment to personal injury—"damages for emotional distress"—but Quaker emphatically rejected that request. We hold that this arm's-length agreement, made by the parties in good faith, is controlling in determining the taxability of the amounts received by petitioners.

In principle, the facts of the instant case are similar to those in *Knuckles v. Commissioner, supra*, where the taxpayer's employer, Perpetual, terminated his employment contract, and the taxpayer claimed damages. After lengthy settlement negotiations, Perpetual and the taxpayer agreed on a lump-sum settlement amount. In drafting the closing agreement calling for payment of that amount, the taxpayer's counsel insisted that Perpetual allocate all or a portion of that sum to a tort claim for personal injury. Consistent with Quaker's position in the instant case, Perpetual at that time and during all the negotiations refused to recognize any liability in tort on its part. The settlement agreement was finally signed and, despite the taxpayer's insistence, it allocated nothing to the personal injury claim. Holding that the full amount of the settlement payment was taxable, the Court of Appeals stated that the issue to be decided was factual and emphasized that the most important fact, "in the absence of an express personal injury settlement agreement, is the intent of the payor as to the purpose in making the payment." The court pointed out that Perpetual, like Quaker in the 1972 negotiations, never acknowledged and always denied any possible liability for personal injuries to the taxpayer (349 F.2d at 613). Respondent's case is even stronger here because the 1972 settlement agreement contained an express allocation of the settlement amount.

Petitioners pin their case largely on the 1980 settlement agreement insofar as it purported to reform paragraph 4 of the 1972 agreement. Paragraph 4, as revised, called for Quaker to pay petitioners $425,000, the already-paid amount specified in the 1972 agreement, but reallocated that amount as follows: $258,334 (instead of possibly $1) for "damages due to physical and emotional distress" arising out of their Magic Pan, Inc., employment; $100,000 (the same amount) for the purchase of capital assets; and the balance of $66,666 (instead of $324,999) to rights and claims under the employment agreements.

Under this allocation, made almost 8 years after they received the $425,000 payment, petitioners contend that the $258,334 is nontaxable under section 104(a)(2). We do not agree.

The courts have not looked with favor upon retroactive revisions of written instruments, or even State court decrees, as a ground for determining tax liabilities. In *Van Den Wymelenberg v. United States*, 397 F.2d 443, 445 (7th Cir. 1968), where the parties executed an amended trust agreement to support their claim to a gift tax exclusion under section 2503(c), the court explained:

As to the parties to the reformed instrument the reformation relates back to the date of the original instrument, but it does not affect the rights acquired by non-parties, including the Government. Were the law otherwise there would exist considerable opportunity for "collusive" state court actions having the sole purpose of reducing federal tax liabilities. Furthermore, federal tax liabilities would remain unsettled for years after their assessment if state courts and private persons were empowered to retroactively affect the tax consequences of completed transactions and completed tax years.

To the same effect, see *Emerson Institute v. United States*, 356 F.2d 824, 826 (D.C. Cir. 1966); *Piel v. Commissioner*, 340 F.2d 887, 889 (2d Cir. 1965), affg. a Memorandum Opinion of this Court; *Straight's Trust v. Commissioner*, 245 F.2d 327, 329 (8th Cir. 1957), affg. 24 T.C. 69 (1955); *Newman v. Commissioner*, 222 F.2d 131, 136 (9th Cir. 1955), affg. 19 T.C. 708 (1953); *Sinopoulo v. Jones*, 154 F.2d 648, 650–651 (10th Cir. 1946); *Gaylord v. Commissioner*, 153 F.2d 408, 415 (9th Cir. 1946), affg. 3 T.C. 281 (1944); *Roderick v. Commissioner*, 57 T.C. 108, 112 (1971); cf. *Flitcroft v. Commissioner*, 328 F.2d 449 (9th Cir. 1964), revg. and remanding 39 T.C. 52 (1962) (sustaining a retroactive amendment designed to carry out the conceded original intention of the parties). In the light of these cases, we hold that the 1980 settlement agreement does not control petitioners' tax liability for 1972.

Petitioners argue at length, however, that the 1980 settlement agreement, not the 1972 agreement, accords with the "economic realities" and should, therefore, be accepted as controlling. As a basis for that argument, petitioners testified in vivid detail concerning their mistreatment at the hands of one or more Quaker executives and the adverse emotional and psychological consequences of that treatment. They presented the testimony of a psychiatrist who treated Mrs. Fono for her

emotional problems and the testimony of a lawyer specializing in personal injury litigation who gave his evaluation of petitioners' damage claim against Quaker. All of this evidence was designed to show that the 1980 settlement reflected the "economic realities" and should, therefore, govern their 1972 tax liabilities.

We are not convinced that a weighing of the "economic realities"—i.e., the merits of the petitioners' claims against Quaker in the instant case—is the standard to be applied where a taxpayer challenges the allocation in his own agreement. Section 104(a)(2) allows the exclusion only for damages received, whether by suit or agreement, "on account of personal injuries." In *Agar v. Commissioner*, 290 F.2d 283, 284 (2d Cir. 1961), affg. per curiam a Memorandum Opinion of this Court, the court stated that the taxpayer's belief as to the reasons for the payment was only evidence of its character and that "the ultimate inquiry is into the 'basic reason' for the company's payment." In *Seay v. Commissioner*, 58 T.C. 32, 37 (1972), the Court held that "the determination of whether a settlement payment is exempt from taxation depends on the nature of the claim settled and not on the validity of the claim." We have already pointed out that the court in *Knuckles v. Commissioner*, 349 F.2d at 613, stated that the most important fact under section 104(a)(2) "is the intent of the payor as to the purpose in making the payment." We think, therefore, that petitioners' so-called "economic realities" argument misses the point. It is not up to this Court to evaluate the validity of the claim, but rather to determine the actual reason Quaker made the payment. As pointed out, Quaker refused to pay anything for petitioners' mental distress.

Even if the so-called "economic realities" are the controlling criteria, moreover, we are not satisfied that they are more accurately reflected by paragraph 4 as revised by the 1980 agreement than by the original paragraph 4 of the 1972 agreement. We have already pointed out that the 1972 agreement was the product of protracted negotiations much closer in terms of time than the 1980 agreement to the events leading to the damage claim—when the parties more clearly had in mind their expectations under the 1969 agreements.

Mrs. Fono testified that petitioners' negotiations with Quak-

er leading to the 1969 agreements indicated that the royalty provisions on the patents and crepes recipes would produce as much as $600,000 over a 10-year period; projections for the employment bonus provisions indicated they were "supposed to pay out under the worst conditions at least one million, two hundred thousand or in that neighborhood." A representative of Quaker testified that Quaker "expected to pay them, oh, anywhere between a million and a million and a half" in bonuses. Mrs. Fono further testified that the reason they sold to Quaker was "to make these additional benefits from the fruits of our invention and work."

Mrs. Fono testified that, as early as November 1971, she and Mr. Fono realized that their "contracts would not work out," because the bonus clauses were keyed to net profits rather than gross sales and were so drafted as to permit deductions for the startup costs of new restaurants. These costs included 15 percent of the "value of leases" which "value shall be determined by multiplying the annual rent by the number of years the lease has to run." The result was that: "The more * * * [the operations] were expanded, the worse the bonus clauses would have been for us." Also, Quaker decided not to attempt to develop a frozen crepes market. In January 1972, the Fonos retained Melchior to represent them, and Mrs. Fono testified that they suggested at the outset that he ask Quaker "for the projections and all the originally [sic] representations made what induced us to sell our business." The negotiations from the beginning were thus focused on Quaker's failure to produce the anticipated profits.

Melchior explored several possibilities, such as a new bonus agreement based on gross sales and an agreement to make the petitioners consultants. Finally, a decision was reached on a $425,000 cash settlement coupled with a termination of the employment agreements. Drafts of a proposed settlement agreement were made available to petitioners, and they studied the document, including the allocation of the $425,000 to their various claims. As set forth in our findings, Mrs. Fono's copy shows that she proposed that $100,000 be allocated to long-term capital gain for the patent-recipe royalty contract, $75,000 for the employment, and $250,000 for "Damages—Non Performing"; as to the meaning of nonperforming, she testified: "We never got paid for our business. So, it was

lack of performance of both contracts. But the damage represented what they did to us." As stated in our findings, Mr. Fono's copy contained similar notations.

The evidence is thus clear that petitioners initially expected to realize over $1 million in bonuses under their employment and royalty contracts. Mrs. Fono testified that: "We never got one single dollar except in * * * [the] form of settlement." Because of their disappointment in Quaker's performance, they sought a reformation of the 1969 agreements or damages. In negotiating the 1972 agreement, they instructed Melchior to ask for an allocation of some portion of the $425,000 to their personal injury claim, but Quaker adamantly refused to make such an allocation. The parties finally agreed to settle by allocating $100,000 to the patent-recipe assignment contract and $324,999 to the employment agreements. The agreement allocated $1 to all other claims. Thus, consistent with the initial reasons in 1972 for seeking a reformation or damages from Quaker, the settlement allocated the recovery in such way as to compensate them, at least to some extent, for the disappointing results of the Magic Pan operations in Quaker's hands.

In 1975, petitioners filed the $26,900,000 suit that led to the 1980 agreement. They charged, among other things, fraud, breach of contract, defamation, and intentional infliction of mental distress. In bitter, prolonged pretrial activity, Quaker spent over $500,000 in legal fees and expenses. Quaker anticipated that additional expenses of over $175,000 would be required if the case went to trial. Rather than run the risk of an adverse judgment based on a jury verdict, Quaker decided to settle the case on the terms of the 1980 agreement. The evidence is clear that Quaker settled in order to cut its losses, not on the basis of an objective evaluation of the Fonos' claims.

Given these facts, we cannot find that the 1980 agreement's version of paragraph 4 more accurately reflects the economic realities—the merits of petitioners' 1972 claim against Quaker—than the 1972 agreement. When petitioners entered into the 1972 settlement, they were capable and experienced business people, conscientiously advised by a competent attorney. They read and criticized the allocation provisions and instructed their attorney to negotiate for an agreement more favorable in terms of an allocation. He was unable to obtain

the allocation they wished and advised them to take Quaker's offer. They were not fully satisfied with the agreement, but they understood its substance and content. They must have understood that give and take are part of the negotiation and settlement process. Petitioners ultimately signed the 1972 agreement and accepted the $425,000 payment.

Petitioners' evidence does not constitute "strong proof" that a different allocation was intended or more accurately reflects the economic realities.[13] It would be incongruous, as contemplated by the 1980 agreement, to hold that $258,334 of the 1972 payment of $425,000 actually represented a recovery for personal injuries when Quaker adamantly refused to acknowledge any liability on that ground. It would be equally incongruous to allocate only $66,666 to rights under the employment agreement when petitioners admitted that they initiated the negotiations leading to the 1972 settlement agreement mainly because of their disappointment with the working of the bonus provisions under which they had expected to receive well over $1 million.[14]

At most, petitioners have shown that, even though they were informed of the tax consequences of the 1972 settlement, they did not fully grasp them at the time they entered into it. As stated by the court in *Hamlin's Trust v. Commissioner,* 209 F.2d 761, 765 (10th Cir. 1954), affg. 19 T.C. 718 (1953):

---

[13]In certain areas, including covenants not to compete, some courts, including this Court, have adopted a rule that a taxpayer challenging an allocation must offer "strong proof" that a different allocation better reflects the parties' actual intent and the underlying realities. *Schulz v. Commissioner,* 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *Ullman v. Commissioner,* 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); *Major v. Commissioner,* 76 T.C. 239, 247 (1981). Compare *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), and *Spector v. Commissioner,* 641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), requiring a showing of fraud, duress, or mistake. For the reasons stated in the text, it is not at all clear that the "strong proof" rule applies in cases under sec. 104(a)(2). If it does, however, petitioners' proof does not meet that standard.

[14]Petitioners cite *Dixie Finance Co. v. United States,* 474 F.2d 501 (5th Cir. 1973), affg. a Memorandum Opinion of this Court, and *Fidler v. Commissioner,* T.C. Memo. 1980–346, for the proposition that the Court, when confronted with two contending allocations, is not required to hold the earlier one binding; instead, it may enforce either one, based on its judgment as to which is the more accurate reflection of the intent of the parties and the underlying economic realities. Even accepting petitioners' reading of these cases, however, they would not require us to hold that the 1980 settlement controlled the taxation of the moneys petitioners received in 1972. As discussed above, we believe that economic reality, the intent of the parties, and the arm's-length bargaining on the merits are better reflected in the allocation contained in the 1972 settlement. Cf. *Spector v. Commissioner, supra* at 383–384.

It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences.

Accordingly, we hold that the tax consequences of the payment to petitioners under the 1972 settlement are governed by the allocation provided for in that agreement, and that respondent has correctly determined that the amount of $325,000 represented ordinary income to petitioners, and the amount of $100,000 represented long-term capital gain.

To reflect the foregoing,

*Decision will be entered for the respondent.*