JENNE K. BRITELL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Britell v. Commissioner
Docket No. 26958-93
United States Tax Court
T.C. Memo 1995-264; 1995 Tax Ct. Memo LEXIS 265; 69 T.C.M. (CCH) 2904; June 15, 1995, Filed *265 Decision will be entered under Rule 155. Approximately 16 months after she started employment as a senior officer at two related banks, the banks asked P to resign because of her managerial style. P retained counsel who threatened to sue the banks for sex discrimination. The banks gave P a generous severance package that they routinely gave to similar officers who were asked to resign. The written agreement underlying the package contained a general release of all claims that may have arisen from P's employment with the banks, and did not explicitly refer to P's sex discrimination claim. The banks paid P $ 102,288.48 in 1990 pursuant to the agreement, and the banks included this payment on P's Form W-2, Wage and Tax Statement. Held: The $ 102,288.48 payment is includable in P's gross income under sec. 61(a), I.R.C.
For petitioner: Daniel Jacobson and Steven P. Kaplan. For respondent: Craig Connell. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Jenne K. Britell petitioned the Court to redetermine respondent's determination of a $ 32,415.92 deficiency in her 1990 Federal income tax and a $ 6,483.19 addition thereto under section 6662(a). Following respondent's *266 concession of the addition to tax, we must decide whether a $ 102,288.48 payment received by petitioner from her former employer is excludable from her gross income under section 104(a)(2). Section references are to the Internal Revenue Code in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioner resided in Englewood, New Jersey, when she petitioned the Court. She timely filed a 1990 Form 1040, U.S. Individual Income Tax Return, using the filing status of "Married filing separate return". Petitioner prepared this return herself. In April 1988, petitioner commenced work as a senior vice president of Republic National Bank of New York (Republic) and as an executive vice president of Republic's subsidiary, Williamsburgh Savings Bank (Williamsburgh), at an annual salary of $ 135,000 (Republic and Williamsburgh are collectively referred to as the Banks). The Banks hired petitioner to direct their mortgage business. The Banks did not have an employment contract with *267 petitioner. Petitioner reported directly to John Tamberlane (Tamberlane), Republic's executive vice president for retail banking. On August 15, 1989, and August 16, 1989, Tamberlane asked petitioner to resign her position at the Banks because he was dissatisfied with her management style. Immediately thereafter, petitioner retained a law firm to advise her on the situation. The firm referred the matter to one of its litigating partners, Donald S. Zakarin (Zakarin). Zakarin contacted the Banks' lawyer and threatened to file a sex discrimination lawsuit against the Banks on behalf of petitioner. Following approximately 4 months of discussions between Zakarin and the Banks' lawyer, petitioner and the Banks executed a settlement and release agreement (the Agreement). The Banks routinely entered into similar agreements with their key officers who were asked to resign. John Guiton (Guiton) was the executive vice president of Republic's human resources department. Guiton signed the Agreement on behalf of the Banks in the ordinary course of his employment with the Banks. When he signed the Agreement, Guiton did not think that he was settling a sex discrimination claim, but thought *268 that he was granting a severance package that the Banks typically gave to officers who were asked to resign. The size of the severance package was consistent with previous severance packages, and Tamberlane had recommended a separation package for petitioner because he had recruited her and wanted the Banks to sever their relationship with her on good terms. In relevant part, the Agreement provided: AGREEMENT OF SETTLEMENT AND RELEASE
Agreement made this 15th day of November, 1989 by and among Dr. Jenne K. Britell ("Britell") and Republic National Bank of New York (RNB), Republic New York Corporation (RNYC)[1] and Williamsburgh Savings Bank (WSB) (referred to collectively as the "Bank"). WHEREAS, Britell was employed by the Bank to build its mortgage business, improve its mortgage systems and operations and establish it as a quality vendor to the primary and secondary mortgage markets; and WHEREAS, Britell has accomplished or exceeded all of the *269 Bank's business goals; and WHEREAS, during the course of her employment, it became apparent that Britell's management style, though effective to accomplish the business goals, varied from the management style of the Bank giving rise to disagreements between the parties; and WHEREAS, Britell and the Bank desire to resolve and settle in full any and all claims that Britell had, has or may have against RNB, RNYC, WSB or any of their subsidiaries, affiliates, related business entities or past or present employees; Now, therefore, Britell and the Bank agree as follows: 1. Britell hereby relinquishes her duties as head of the mortgage operations of WSB. Britell will continue to be employed as a Senior Vice President of RNB and as an Executive Vice President of WSB until September 1, 1990 or sooner as provided herein, when she will resign and terminate her employment with the Bank. * * * During the period that Britell continues to be employed by the Bank, she will be provided with a closed door office and secretarial support, including telephone coverage and other usual amenities provided to senior officers of the Bank, at RNB's headquarters as 452 Fifth Avenue, New York City. Britell *270 will be free to seek and accept alternative employment before September 1, 1990, and may take time off as needed for that purpose. If Britell accepts alternative employment to begin before September 1, 1990, her resignation will become effective as of the date she begins such alternative employment. 2. Upon the execution hereof, and in consideration for the mutual releases and covenants contained in paragraphs 5 through 17, the Bank shall pay to Britell $ 50,000, less all withholding taxes required by law, plus an amount equal to the price of the Bank's stock as of the close of trading on the New York Stock Exchange on the date of the execution of this Agreement by Britell multiplied by 1250. Upon such payment, Britell will surrender her rights, whether vested, contingent or restricted, to 1250 shares of the Bank's stock. In addition, the Bank will continue to pay to Britell until September 1, 1990, her current salary, at a rate of $ 135,000 a year, less all withholding taxes required by law. This amount will be paid to Britell on a bi-weekly basis, unless she resigns her employment with the Bank before September 1, 1990, in which case Britell will receive the balance of her *271 salary in a lump sum on the effective date of her resignation. 3. Britell will also continue to receive the health and other benefits to which she is now entitled until September 1, 1990, unless Britell accepts alternative employment to begin before September 1, 1990 * * *. At the time of her resignation, or such earlier date on which profit-sharing monies are paid to Bank employees, Britell will receive from the Bank payment of her profit-sharing money for the year 1989. Britell will not be entitled to profit-sharing money for the year 1990. 4. Simultaneous with the receipt of this Agreement signed by Britell, the Bank will transfer to her title of a certain automobile * * * which she possesses. * * * 5. Without limiting the release set forth in paragraph 7, the aforementioned payments, benefits, automobile, and office space shall be in full and final settlement of any and all claims against RNB, RNYC and WSB and their respective subsidiaries, affiliates, related business entities, successors or assigns, and/or any individual now or previously employed by the Bank or any of their respective subsidiaries, affiliates, or related business entities, for damages allegedly suffered *272 by Britell as the result of her employment with, resignation from or termination by the Bank, including all attorneys fees, costs and disbursements.
* * * 7. In consideration for the payments, benefits, automobile, and office space provided for by paragraphs 1 through 4 and for the assurances and mutual release contained in paragraphs 6 and 8 through 17, Britell for herself, her heirs, executors, administrators, successors and assigns, hereby releases and forever discharges RNB, RNYC and WSB, including any and all of their respective subsidiaries, affiliates, related business entities, successors or assigns, and/or any individual now or previously employed by RNB, RNYC and/or WSB or their respective subsidiaries, affiliates, or related business entities, of and from all manner of actions, proceedings, causes of action, suits, charges, complaints, debts, sums of money, accounts, contracts, controversies, agreements, promises, damages, judgments, claims, and demands whatsoever, whether arising in law or in equity, including but not limited to any claims arising out of any federal, state or city constitution, statute, ordinance, by-law or regulation (including but not limited *273 to all claims relating to or arising out of Britell's employment with, resignation from or termination by the Bank and all claims for attorneys fees, costs, disbursements, or the like), which Britell ever had, now has, or which she or her heirs, executors, administrators, successors, and/or assigns can, or may have up to and including the date of this Agreement. Specifically excluded from this release are any claims arising from a violation of this Agreement, including any violation of the confidentiality provision and the non-disparagement provision hereof.
* * * 18. The Bank's personnel records will reflect that Britell voluntarily resigned from its employ. * * * 19. This Agreement contains the entire agreement and understanding between Britell and the bank and supercedes [sic] any prior agreements or understandings between them regarding the subjects addressed herein. * * *
* * * 21. The parties acknowledge that they have been represented by independent legal counsel of their own choice throughout all of the negotiations preceding the execution of this Agreement of Settlement and Release and that they have executed this Agreement of Settlement and Release *274 with the consent and after consultation with such independent legal counsel. The parties further acknowledge that they have read this Agreement of Settlement and Release in its entirety, they have had all of its provisions explained to them by their counsel who have answered any and all questions which they have asked with regard to the meaning of any of the provisions thereof, and that they assent to all the terms and conditions contained herein. WHEREFORE, the parties hereto have caused this Agreement to be signed as of the day and date first above written.
JENNE K. BRITELL, REPUBLIC NATIONAL BANK OF NEW YORK
By: John Guiton, On Behalf of RNB, RNYC and WSB
On January 25, 1990, petitioner wrote a letter to Guiton advising him that she was resigning her position with the Banks as of February 1, 1990. On February 2, 1990, Republic paid petitioner the balance of her salary from January 1, 1990, to September 1, 1990. During the 1990 calendar year, Republic paid petitioner $ 102,288.48, net of withholding taxes, pursuant to the Agreement. The Banks considered this payment to be taxable employee wages. Manhattan Savings Bank, a subsidiary of Republic, issued petitioner a 1990 *275 Form W-2, Wage and Tax Statement, reporting that petitioner was paid employee compensation of $ 102,288.48 during 1990. Petitioner did not include any of the $ 102,288.48 in her 1990 gross income. She attached a Miscellaneous Statement to her 1990 Form 1040 stating: "I have excluded from income $ 102,288.48 included in the W2 received from Manhattan Savings Bank subsequent, and pursuant to, a written agreement settling claims relating to the termination of my employment." Respondent determined (and reflected in her notice of deficiency) that the $ 102,288.48 payment was includable in petitioner's 1990 gross income. Respondent determined that petitioner had not "established that the income received was for damages paid pursuant to your claim for tort relief on account of personal injuries or sickness." OPINION Section 104(a)(2) and the regulations thereunder would exclude the funds at issue from petitioner's gross income if: (1) Her underlying cause of action giving rise to the recovery of these funds was based upon tort or tort type rights and (2) the funds were received on account of personal injuries or sickness. Sec. 104(a)(2); sec. 1.104-1(c), Income Tax Regs.; Commissioner *276 v. Schleier,     U.S.     (June 14, 1995). This case involves a factual determination; i.e., did petitioner receive the $ 102,288.48 from the Banks on account of a tort-like claim for sex discrimination. To the extent that she did, respondent has conceded in her brief that the funds are not taxable to petitioner. Sec. 104(a)(2). To the extent that petitioner did not, the funds are includable in her gross income. Sec. 61(a). Because respondent determined that the funds are not excludable from petitioner's gross income under section 104(a)(2), the burden of proof is on petitioner to show otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Robinson v. Commissioner, 102 T.C. 116, 124 (1994). Section 104(a)(2) and the regulations thereunder allow a taxpayer to exclude from gross income damages received (whether by suit or agreement) on account of a tort-like personal injury. In the context of a settlement agreement, the nature of the claim underlying the taxpayer's damage award, rather than the validity of his or her claim, determines whether damages are so received. United States v. Burke, 504 U.S. 229, 235, 112 S. Ct. 1867, 1872 (1992); *277 Robinson v. Commissioner, supra at 125-126; Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without opinion 845 F.2d 1013 (3d Cir. 1988); Bent v. Commissioner, 87 T.C. 236, 244 (1986), affd. 835 F.2d 67 (3d Cir. 1987); see also Rickel v. Commissioner, 900 F.2d 655 (3d Cir. 1990), affg. in part and revg. in part 92 T.C. 510 (1989); Byrne v. Commissioner, 883 F.2d 211 (3d Cir. 1989), revg. and remanding 90 T.C. 1000 (1988). Ascertaining the nature of the claim is a factual determination that is generally made by reference to the settlement agreement, in light of the facts and circumstances surrounding it. Critical to this determination is the "intent of the payor" in making the payment. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir. 1961), *278 affg. per curiam T.C. Memo. 1960-21. We ask ourselves: "In lieu of what were the damages awarded?" Robinson v. Commissioner, supra at 126-127, and the cases cited therein. Although the payee's belief is relevant to this inquiry, the ultimate character of the payment hinges on the payor's dominant reason for making the payment. Commissioner v. Duberstein, 363 U.S. 278, 286 (1960); see Agar v. Commissioner, supra at 284; Fono v. Commissioner, 79 T.C. 680 (1982), affd. without opinion 749 F.2d 37 (9th Cir. 1984). Based on our review of the Agreement, and the facts and circumstances surrounding it, we are not persuaded that the Banks made the $ 102,288.48 payment to petitioner to settle a sex discrimination claim that she had against them. To the contrary, the record indicates that the Banks made the payment to compensate petitioner for her employment with them and for her severance of employment from them. Petitioner focuses in her brief on the fact that Zakarin believed that petitioner had *279 a "viable claim" for sex discrimination, and he did not believe that she had a legal right to severance pay. In so doing, petitioner's focus is misplaced. The record shows that the Banks made the payment to petitioner in order to reward her for her past services to them and to make her severance from them as amicable as possible. Among other things, the Agreement contained no express reference to a sex discrimination claim, stating instead that the payment arose from the Banks' dissatisfaction with petitioner's managerial style; the Banks withheld taxes on the payment and issued petitioner a 1990 Form W-2 with respect thereto; petitioner's salary, health and other benefits continued until September 1, 1990, unless she resigned earlier; and the Agreement stated that petitioner would "continue to be employed" by the Banks until September 1, 1990, unless she resigned earlier. [2] See Beckey v. Commissioner, T.C. Memo. 1994-514. *280 Petitioner argues in her brief that the record contains no tangible evidence of her sex discrimination claim because the Banks did not want her claim documented. However, we are unable to conclude that the Banks paid her with respect to a sex discrimination claim without proper documentation of such a claim in the record. In sum, the record does not establish that the Banks made the $ 102,288.48 payment to petitioner to settle a sex discrimination claim that she had against them. Petitioner's severance package was akin to prior severance packages given to similar officers (including at least one male officer) who were asked to resign, and we are not persuaded on this record that any portion of the payment to petitioner is attributable to a claim of sex discrimination. We have considered all arguments made by petitioner and, to the extent not discussed above, find them to be without merit. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. RNYC was the consolidated group that included the Banks.↩
2. We also note that the parties stipulated that Tamberlane would have testified in this proceeding that sex discrimination was not a factor in his asking petitioner to resign.↩