T.C. Memo. 1999-374


UNITED STATES TAX COURT


SALVATORE J. D'AMICO AND SHIRLEY E. D'AMICO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20087-97.              Filed November 10, 1999.


Salvatore J. D'Amico, pro se.

<u>Stephen C. Best</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, <u>Judge</u>:  Respondent determined a deficiency of

$10,695 in petitioners' Federal income tax for 1994.  The issue

for decision is whether petitioners are entitled for 1994 to

exclude certain amounts from their gross income under section 104(a).[1]  We hold that they are not.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Littleton, Colorado, at the time they filed the petition.

In August 1991, Pro Bakers Limited, a.k.a. Heinz Bakery Products (Heinz Bakery Products or the Company), a corporation affiliated with H.J. Heinz Company, hired petitioner Salvatore J. D'Amico (Mr. D'Amico), who had had many years of experience in the baking industry, to serve as the general manager of its plant in Buffalo, New York.  During 1992, Heinz Bakery Products as-signed additional duties and responsibilities to Mr. D'Amico. In March 1993, Mr. D'Amico, who was still employed by the Company, suffered a heart attack.

On August 17, 1993, Paul Sneddon (Mr. Sneddon), the presi-dent of Heinz Bakery Products, wrote a memorandum (Mr. Sneddon's August 17, 1993 memorandum) to Mr. D'Amico in order to memorial-ize a meeting that had recently taken place between them. Mr. Sneddon's August 17, 1993 memorandum, inter alia, summarized Mr. D'Amico's career at Heinz Bakery Products and expressed dissatis-

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

faction with certain aspects of Mr. D'Amico's work performance for the Company.

On September 27, 1993, Mr. Sneddon wrote another memorandum (Mr. Sneddon's second memorandum) to Mr. D'Amico. That memorandum informed Mr. D'Amico that his employment with Heinz Bakery Products was terminated, outlined the terms of a severance package that the Company was offering to him (severance package), and indicated that Mr. D'Amico had a period of 21 days within which to sign a release form indicating his acceptance of the severance package. Mr. D'Amico suffered a second heart attack on September 27, 1993, the date of Mr. Sneddon's second memorandum to him.

In October 1993, Mr. Sneddon sent a letter to Mr. D'Amico in which Mr. Sneddon indicated that, because of Mr. D'Amico's hospitalization as a result of his second heart attack, the Company was extending until November 2, 1993, the period within which Mr. D'Amico was permitted to sign a release form indicating his acceptance of the severance package.

In October 1993, Mr. D'Amico retained Thomas S. Gill (Mr. Gill), an attorney, to represent him regarding the Company's termination of his employment. On October 21, 1993, Mr. Gill wrote a letter on behalf of his client Mr. D'Amico (Mr. Gill's October 21, 1993 letter) to Daniel Vogus (Mr. Vogus), an attorney for Heinz Bakery Products. Mr. Gill's October 21, 1993 letter

informed Mr. Vogus that Mr. D'Amico "would like to receive payment in the form of mental distress damages" and suggested certain language to be included in any settlement agreement entered into by Mr. D'Amico and the Company. Mr. Gill's October 21, 1993 letter also summarized Mr. Gill's view of certain case law under section 104 and concluded:

> Although I am sure that Heinz and Mr. D'Amico could never agree on whether his termination was wrongful, I have explained to you how it might be analyzed to show that it was. Under these circumstances, it seems to me that Heinz could in good faith enter into a settlement agreement with Mr. D'Amico which has the effect of making the settlement payment nontaxable to Mr. D'Amico. Please consider doing this.

Mr. Gill and Mr. Vogus and other attorneys for Heinz Bakery Products engaged in settlement negotiations regarding Mr. D'Amico's termination by the Company. Those negotiations resulted in an agreement (settlement agreement) that was executed by Mr. D'Amico and Heinz Bakery Products on December 29, 1993, and January 14, 1994, respectively. Mr. D'Amico never filed a lawsuit against Heinz Bakery Products.

In the settlement agreement, (1) Mr. D'Amico asserted in section 2, entitled "Employee Claim", that his heart condition was a factor that "made a difference" in the Company's decision to terminate his employment and further asserted that, as a result of that termination, he suffered a heart attack; and

(2) the Company denied in section 3, entitled "No Company Wrong-doing", (a) that Mr. D'Amico's heart condition was a factor in its decision to terminate him, (b) that Mr. D'Amico suffered a heart attack as a result of his termination by the Company, and (c) that it committed any wrongdoing whatsoever in terminating his employment.  Pursuant to the settlement agreement, the Company agreed to pay Mr. D'Amico (1) $62,616.45 for mental distress damages (in addition to $12,383.56 that previously had been paid to him) and (2) $10,000 in consideration for the covenants of secrecy contained in section 5 of the settlement agreement (covenants of secrecy), the release contained in section 7 of that agreement (release), and the other covenants and obligations in the settlement agreement (other covenants and obligations) to which Mr. D'Amico agreed.  The Company also agreed under the settlement agreement (1) to pay the cost of Mr. D'Amico's medical benefits through September 1994 (i.e., $902) and (2) to purchase the automobile that it was leasing from a third person and that was being used by Mr. D'Amico (leased automobile) and to transfer the ownership of that automobile to Mr. D'Amico.

The sections of the settlement agreement relating to the covenants of secrecy and the release provided:

> 5.    Secrecy.    Employee acknowledges that during his employment with the Company he learned, conceived, discovered, or invented ideas, inventions, improve-

ments, trade secrets, discoveries, formulas, recipes, standards, processes, packaging, relating to products that the Company or any of its Affiliates produced, manufactured, sold, marketed, distributed, delivered, or had developed or has in development by or for it ("Product Information"). Employee also acknowledges that during his employment he learned certain information regarding the business, organization, sales, marketing, and distribution techniques and plans, financial data, and other information regarding the affairs of the Company and its Affiliates ("Company Information"). All Product Information, whether of a patentable nature or not, and all Company Information shall be the sole and absolute property of the Company. The Company shall be the sole and absolute owner of all patent and other rights in connection with such Product Information and Company Information. Employee at all times shall keep all Product Information and Company Information secret from everyone and shall not use for his own purposes or disclose such matters to anyone except to Company personnel and to others as the Company authorizes. Employee shall not divulge, furnish, or make accessible any of the Product Information or Company Information or anything relating to the same to any competitor or other person, firm, or corporation except when the Company authorizes him in writing to do so. In addition, Employee shall not disparage the Company or its Affiliates or take any action to damage the business of the Company or its Affiliates. As used in this Agreement, the term "Affiliates" shall mean any company that controls, is controlled by, or is under common control with the Company, including, but not limited to, any direct or indirect subsidiary or division of H.J. Heinz Company.

6. <u>Acknowledgment</u>. Employee acknowledges that:
a. It is reasonable and necessary for the protection of the business and goodwill of the Company and its Affiliates, for Employee to enter into this Agreement, especially the confidentiality provisions.
b. The Company would suffer irreparable injury if Employee breaches any of the provisions of paragraph 5 of this Agreement.

7. <u>Release</u>.
a. Employee, on behalf of himself, his heirs, estate, executors, administrators, successors,

and assigns fully waives, releases, and discharges the Company and its Affiliates and their officers, directors, employees and agents (collectively the "Releasees") from all actions, causes of action, claims, judgments, obligations, damages and liabilities of whatsoever kind and character, occurring from the beginning of time to the date of this Agreement, including, but not limited to, any such claims arising out of or relating to Employee's employment, the termination of such employment, and any acts or events involving him and the Company or any Affiliate.

      b.    Employee represents that he has not:

      (1)  filed or joined any claim, complaint, charge, or lawsuit that is currently pending against any Releasee with any governmental agency, any court, or any other body;

      (2)  assigned to any other person or entity any such claim, complaint, charge, or lawsuit; or

      (3)  authorized any other person or entity to assert any such claim, complaint, charge, or lawsuit on his behalf.

      c.    Employee shall not:

      (1)  file or join any claim, complaint, charge, or lawsuit against any Releasee with any governmental agency, any court, or any other body;

      (2)  assign to any other person or entity any such claim, complaint, charge, or lawsuit; or

      (3)  authorize any other person or entity to assert any such claim, complaint, charge, or lawsuit on his behalf.

      d.    Employee waives:

      (1)  any claim for damages incurred at any time after the date of this Agreement because of the alleged continuing effects of any alleged acts or omissions involving any Releasee that occurred on or before the date of this Agreement; and

      (2)  any right to sue for monetary or injunctive relief against the alleged continuing effects of past acts or omissions occurring before the date of this Agreement.

    8.    <u>Extent of Release</u>.  Employee understands and agrees that the release and waiver set forth in para-

graph 7 of this Agreement extends to all rights and claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, that existed before the execution of this Agreement, including, but not limited to, all rights and claims involving race discrimination, sex discrimination, age discrimination, or discrimination against persons with disabilities based upon Title VII of the federal Civil Rights Act of 1964, as amended, (42 U.S.C. §2000e et seq.), the federal Age Discrimination in Employment Act, as amended, (29 U.S.C. §621 et seq.) or the federal Americans with Disabilities Act (42 U.S.C. §12101 et seq.) or similar state or local statutes, or otherwise and all claims in tort or contract related to Employee's employment or to any acts or omissions of the Company involving Employee. THE RELEASE AND WAIVER SET FORTH IN PARAGRAPH 8 OF THIS AGREEMENT OR OTHERWISE IN THIS AGREEMENT DO NOT RELEASE OR WAIVE ANY CLAIM THAT MAY ARISE AFTER THE DATE EMPLOYEE EXECUTES THIS AGREEMENT OR ANY CLAIM FOR UNEMPLOYMENT COMPENSATION OR WORKERS' COMPENSATION BENEFITS.

The sections of the settlement agreement relating to the other covenants and obligations to which Mr. D'Amico agreed provided:

> 9. <u>Confidentiality of Termination</u>. Employee shall keep strictly confidential and shall not disclose, directly or indirectly, to anyone, including, but not limited to, past, present, and future employees of the Company, any information concerning the settlement or the facts or circumstances that led to the termination of employment and this Agreement ("Termination Information"). Employee shall also cause his representatives, agents, and attorneys to keep strictly confidential, and to agree with the Company:
>> a. not to disclose, directly or indirectly, to anyone, including, but not limited to, past, present, and future employees of the Company, any Termination Information; and
>> b. not to represent any past, present, or future employee of the Company with respect to termination of employment by the Company.
> The Employee retains the right to disclose the contents of this Agreement to the United States Internal Revenue

Service or any state taxing agency for the purpose of supporting and defending the Employee's income tax return or other tax return and further retains the right to present it in any administrative or judicial proceeding where it becomes relevant upon 10 days prior written notice to the Company of the Employee's intention to do so and an explanation of the need for doing so.  In either case, Employee, at Employee's expense, shall take such steps as the Company requests to obtain a confidentiality agreement, protective order, or other protection of the confidentiality of the contents of this Agreement.

*      *      *      *      *      *      *

17.  Indemnity.  As a further material inducement to the Company to enter into this Agreement, Employee shall indemnify and hold the Company and its Affiliates harmless from and against any and all loss, costs, damages, or expenses, including, but not limited to, attorneys' fees, that the Company or its Affiliates incur arising out of any breach of this Agreement by Employee or the fact that any representation Employee makes in this Agreement was false when made.

The settlement agreement also provided in pertinent part:

18.  Non-Reliance.  Employee represents and acknowledges that in executing this Agreement he does not rely and has not relied upon any representation or statement by the Company or any of its Affiliates or their attorneys not set forth in this Agreement with regard to the subject matter, basis, or effect of this Agreement or otherwise.

19.  Entire Agreement.  This Agreement sets forth the entire agreement between Employee and the Company on the subject matter of this Agreement and fully supersedes any and all prior agreements or understandings between the Employee and the Company pertaining to the subject matter of this Agreement.

The Company issued to Mr. D'Amico a Form W-2 for 1994 with

respect to its purchase of the leased automobile and its transfer

of that automobile to Mr. D'Amico during that year (Form W-2

relating to the leased automobile).  That Form W-2 showed "Wages, tips, other comp." of $23,255.77, "Federal income tax withheld" of $1,177.71, "Social security tax withheld" of $1441.86, and "Medicare tax withheld" of $337.21.  The Company also issued one or more Forms 1099 to Mr. D'Amico for 1994.  Those Forms 1099 showed additional income totaling $73,518,[2] which equaled the sum of the three payments that the Company had made to and on behalf of Mr. D'Amico during that year under the settlement agreement for (1) the mental distress damages ($62,616.45), (2) the covenants of secrecy, the release, and the other covenants and obligations ($10,000), and (3) the cost of providing medical benefits to him ($902).  (We shall refer collectively to those Forms 1099 as Forms 1099 relating to the settlement agreement.)

Petitioners reported as income (1) on page 1, line 7 of the joint Federal income tax return that they filed for 1994 (1994 return) the amount of "Wages, tips, or other comp." shown in the Form W-2 relating to the leased automobile[3] and (2) on page 1, line 21 of that return the total of the amounts of income shown in the Forms 1099 relating to the settlement agreement.  However,

---

[2]That total amount was rounded to the nearest dollar.

[3]Petitioners rounded the amount shown in the Form W-2 relating to the leased automobile as "Wages, tips, other comp." (i.e., $23,255.77) to the lowest and nearest dollar.  For convenience, we shall do the same when referring to the amount of income shown in that form.

petitioners also claimed on page 1, line 30 of their 1994 return an adjustment to, i.e., a reduction of, income of $96,773. The amount of that adjustment equaled the aggregate amount of income shown in the Form W-2 relating to the leased automobile and the Forms 1099 relating to the settlement agreement that petitioners reported in their 1994 return. Petitioners attached Form 8275, Disclosure Statement, to their 1994 return with respect to the adjustment to income of $96,773 that they claimed in that return. That form stated:

> WHILE SALVATORE D'AMICO WAS EMPLOYED BY PRO BAKERS LIMITED HE SUFFERED A HEART ATTACK. AFTER HE HAD RECOVERED AND RETURNED TO WORK, HIS EMPLOYMENT WAS TERMINATED UNDER CIRCUMSTANCES GIVING RISE TO THE INFERENCE THAT IT WAS BECAUSE OF HIS HEART ATTACK. SALVATORE D'AMICO AND PRO BAKERS LIMITED ENTERED INTO A SETTLEMENT AGREEMENT, A COPY IS ATTACHED HERETO. PRO BAKERS LIMITED PAID HIM $96,773.29 OF THAT SETTLEMENT IN 1994. THE IRS HAS DETERMINED THAT SUCH PAYMENT IS NOT TAXABLE UNDER SECTION 104 (a)(2) OF THE CODE AND REV RULE 93-88

In the notice of deficiency issued to petitioners (notice), respondent determined to reduce by $34,157 the adjustment to income of $96,773 that petitioners claimed in their 1994 return "because it has not been established that any amount more than $62,616 met the requirements of Section 104". As a result, in the notice respondent increased petitioners' taxable income for 1994 by $34,157.

OPINION

Although respondent determined in the notice to increase petitioners' income by $34,157, respondent concedes in respondent's answering brief that $902 of that amount, which was the cost to the Company of providing medical benefits to Mr. D'Amico under the settlement agreement, is to be excluded from petitioners' gross income under section 106(a). Petitioners bear the burden of showing that respondent erred in determining that the remaining amount, i.e., $33,255, is to be included in their taxable income for 1994. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The total amount of $33,255 that remains in dispute consists of the following two components: (1) $10,000 that the Company paid Mr. D'Amico during 1994 in consideration for the covenants of secrecy, the release, and the other covenants and obligations to which Mr. D'Amico agreed ($10,000 payment) and (2) $23,255 that the Company paid to purchase the leased automobile, the ownership of which it transferred to Mr. D'Amico pursuant to the settlement agreement ($23,255 payment).[4] Petitioners rely on

---

[4]Petitioners advance as an alternative argument for the first time on brief that in the event that the Court were to hold against them under sec. 104(a), the fair market value of the leased automobile, and not the amount that the Company paid to purchase it, should be used in determining the increase in petitioners' income for 1994 that is attributable to that automobile. In this regard, petitioners contend that the fair
(continued...)

section 104(a) to support their position that both the $10,000 payment and the $23,255 payment (collectively, settlement amounts in dispute) are to be excluded from their income for 1994. According to petitioners, those amounts were paid to Mr. D'Amico to settle his claims against the Company for his physical injuries.

Section 61(a) provides the following sweeping definition of the term "gross income":  "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived".  Not only is section 61(a) broad in its scope, see Commissioner v. Schleier, 515 U.S. 323, 328 (1995), exclusions from gross income must be narrowly construed, see id.; United States v. Burke, 504 U.S. 229, 248 (1992).

Section 104(a)(2) on which petitioners rely provides that gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness".

---

⁴(...continued)
market value of the leased automobile is $12,000.  We reject petitioners' alternative contention.  First, that contention was raised for the first time on brief, and respondent did not have the opportunity to introduce evidence with respect to it. Second, there is nothing in the record to support petitioners' position on brief that the fair market value of the leased automobile is $12,000.  Third, on the record before us, we find that it is the cost to the Company of purchasing the leased automobile which is the benefit that Mr. D'Amico received under the settlement agreement and which we hold below is to be included in petitioners' taxable income for 1994.

The regulations under section 104(a)(2) restate the statutory language of that section and further provide:

> The term "damages received (whether by suit or agreement)" means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution. [Sec. 1.104-1(c), Income Tax Regs.]

Where damages are received pursuant to a settlement agreement, such as is the case here, the nature of the claim that was the actual basis for settlement controls whether such damages are to be excluded from income under section 104(a)(2). See United States v. Burke, supra at 237. The crucial question is "in lieu of what was the settlement amount paid?" Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). The determination of the nature of the claim is factual. See Robinson v. Commissioner, 102 T.C. 116, 127 (1994), affd. in part, revd. in part, and remanded on another issue 70 F.3d 34 (5th Cir. 1995); Seay v. Commissioner, 58 T.C. 32, 37 (1972). Where there is a settlement agreement that is entered into in an adversarial context, at arm's length, and in good faith, that determination is usually made by reference to such agreement. See Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Robinson v. Commissioner, supra. If the settlement agreement lacks express language stating what the settlement amount was paid to settle, the intent of the payor is

critical to that determination. See <u>Knuckles v. Commissioner</u>, <u>supra</u>; <u>Agar v. Commissioner</u>, 290 F.2d 283, 284 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960-21. Although the belief of the payee is relevant to that inquiry, the character of the settlement payment hinges ultimately on the dominant reason of the payor in making that payment. See <u>Agar v. Commissioner</u>, <u>supra</u> at 284; <u>Fono v. Commissioner</u>, 79 T.C. 680, 694 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).

The Supreme Court recently summarized the requirements of section 104(a)(2) as follows:

> In sum, the plain language of § 104(a)(2), the text of the applicable regulation, and our decision in <u>Burke</u> establish two independent requirements that a taxpayer must meet before a recovery may be excluded under § 104(a)(2). First, the taxpayer must demonstrate that the underlying cause of action giving rise to the recovery is "based upon tort or tort type rights"; and second, the taxpayer must show that the damages were received "on account of personal injuries or sickness." [<u>Commissioner v. Schleier</u>, <u>supra</u> at 336-337.]

Each of the requirements that must be satisfied in order to qualify the settlement amounts in dispute for exclusion from income under section 104(a)(2) involves two inquiries that are similar. The dual inquiries under the first requirement are whether Mr. D'Amico's underlying claim was based on tort or tort type rights and, if it was, whether the underlying claim gave rise to the payment by the Company of the settlement amounts in dispute. The dual inquiries under the second requirement are

whether Mr. D'Amico's alleged injuries were personal in nature and, if so, whether the settlement amounts in dispute were received on account of those injuries.

We turn first to the $10,000 payment which the Company made to Mr. D'Amico under the settlement agreement for the covenants of secrecy, the release, and the other covenants and obligations to which Mr. D'Amico agreed. On the present record, we find that petitioners have failed to show what portion of the $10,000 payment was made for the covenants of secrecy, what portion was paid for the release, and what portion was paid for the other covenants and obligations.[5]

Assuming arguendo that petitioners had established what portion of the $10,000 payment was attributable to the covenants of secrecy, any such portion was paid by the Company to Mr. D'Amico for his covenant, as set forth in section 5 of the settlement agreement, not to divulge any trade secrets and similar confidential matters that he learned as an employee of the Company. On the record before us, we find that petitioners have failed to establish that any such portion was paid on

---

[5]According to petitioners' 1994 return, the Company reflected the $10,000 payment, as well as certain other payments totaling $73,518, that the Company made to and on behalf of Mr. D'Amico pursuant to the settlement agreement in one or more Forms 1099 relating to the settlement agreement that it issued to him.

account of a tort or tort type claim by Mr. D'Amico alleging personal injuries or sickness.

Moreover, assuming arguendo that petitioners had established what portion of the $10,000 payment was attributable to the release, on the instant record, we find that they have failed to show that any such portion was paid on account of a tort or tort type claim by Mr. D'Amico alleging personal injuries or sickness. In this regard, we do not attribute any particular weight to the general language in section 8 of the settlement agreement, which appears to be boilerplate, releasing the Company from any and all claims including, but not limited to, tort claims.[6]

Finally, assuming arguendo that petitioners had shown what portion of the $10,000 payment was attributable to the other

---

[6]Sec. 8 of the settlement agreement provides that the release extends

> to all rights and claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, that existed before the execution of this Agreement, including, but not limited to, all rights and claims involving race discrimination, sex discrimination, age discrimination, or discrimination against persons with disabilities based upon Title VII of the federal Civil Rights Act of 1964, as amended, (42 U.S.C. §2000e et seq.), the federal Age Discrimination in Employment Act, as amended, (29 U.S.C. §621 et seq.) or the federal Americans with Disabilities Act (42 U.S.C. §12101 et seq.) or similar state or local statutes, or otherwise and all claims in tort or contract related to Employee's employment or to any acts or omissions of the Company involving Employee.

covenants and obligations to which Mr. D'Amico agreed,[7] on the record before us, we find that petitioners have failed to establish that any such portion was paid by the Company on account of a tort or tort type claim by Mr. D'Amico alleging personal injuries or sickness.

We turn now to the $23,255 payment that, pursuant to the settlement agreement, the Company made to purchase the leased automobile, the ownership of which it transferred to Mr. D'Amico. On the instant record, we find that petitioners have failed to establish that the $23,255 payment was made by the Company on account of a tort or tort type claim by Mr. D'Amico alleging personal injuries or sickness.  In fact, the record shows that the Company considered the $23,255 payment to be wage type compensation to Mr. D'Amico, which it reflected in the Form W-2

---

[7]Under sec. 9 of the settlement agreement, Mr. D'Amico agreed to keep strictly confidential and not to disclose any information concerning the settlement or the facts and circumstances that led to his termination of employment by the Company and the settlement agreement, except for disclosure of the settlement agreement to the Internal Revenue Service or any state taxing agency for the purpose of supporting and defending Mr. D'Amico's tax position and/or in any administrative or judicial proceeding where it became relevant.

Under sec. 17 of the settlement agreement, Mr. D'Amico agreed, as a further material inducement to the Company to enter into the settlement agreement, to indemnify and hold the Company and its affiliates harmless from and against any and all loss, cost, damages, or expenses that they incurred arising out of a breach of the settlement agreement or the fact that any representation made by Mr. D'Amico in the settlement agreement was false when made.

relating to the leased automobile that it issued to him.

Based upon our examination of the entire record before us, we find that petitioners have failed to satisfy the requirements necessary under section 104(a)(2) for exclusion of the settlement amounts in dispute from their gross income.[8] We further find on that record that petitioners have failed to carry their burden of showing error in respondent's determination, as modified on brief in petitioners' favor, that they must include the settlement amounts in dispute (i.e., $33,255) in their taxable income for 1994.

To reflect the foregoing and the concession of respondent on brief,

<u>Decision will be entered under Rule 155</u>.

---

[8]We have considered all of the specific contentions and arguments of petitioners relating to the settlement amounts in dispute that are not discussed herein, and we find them to be without merit and/or irrelevant.